James Kenneth BALE, Plaintiff-Appellee,

v.

GLASGOW TOBACCO BOARD OF TRADE, INCORPORATED, Defendant-Appellant.

No. 15670.

United States Court of Appeals Sixth Circuit.

Dec. 8, 1964.

John M. Berry, New Castle, Ky., Carroll M. Redford; Redford & Redford, Glasgow, Ky., Berry & Floyd, New Castle, Ky., on brief, for appellant.

Paul R. Huddleston, of Huddleston & Huddleston, Bowling Green, Ky., for appellee.

E. Gaines Davis, Jr., Frankfort, Ky., Clifford E. Smith, Smith, Reed, Yessin & Davis, Frankfort, Ky., on brief, amici curiæ Danville Tobacco Board of Trade, Inc., and Carrollton Tobacco Board of Trade, Inc.

Before CECIL and PHILLIPS, Circuit Judges, and McCREE, District Judge.

CECIL, Circuit Judge.

This appeal by the defendant-appellant, Glasgow Tobacco Board of Trade, Inc., is from a judgment of the United States District Court for the Western District of Kentucky, enjoining it from enforcing a provision of its by-laws against James Kenneth Bale, plaintiff-appellee. The plaintiff-appellee alleged and the court found that defendant-appellant's system of alloting selling time to plaintiff-appellee in his new tobacco warehouse was an unreasonable restraint of trade in violation of the Sherman Act. (Sections 1 et seq., Title 15 U.S.C.)

The parties will be referred to as plaintiff and defendant, as they were in the District Court. The facts were stipulated and are undisputed. The parties made a joint motion for summary judgment upon the pleadings, admissions and stipulation of facts. The court granted judgment to the plaintiff upon the motion. The action was properly brought in the District Court, jurisdiction being conferred on the court by Section 26,

Title 15, U.S.C., and venue being established under Section 22, Title 15 U.S.C.

Virtually all of the burley tobacco grown in the United States is sold at sixty-one tobacco auction markets, thirty of which are in Kentucky. The Glasgow tobacco auction market was established in 1909, and has been in continuous operation since that time. On August 11, 1937, the defendant was incorporated under Section 248.015, KRS,[1] as a non-profit-nonstock corporation. The incorporators were the individuals and corporations then operating warehouses on the Glasgow market.

All of the markets or boards of trade are subject to certain restrictions, statutory or otherwise, over which each individual board of trade has no control. These restrictions are not in issue here and we are not concerned with them, except as the method of selling tobacco at auction furnishes background for the presentation of the question involved on this appeal.

After the tobacco is harvested by the farmers, it is delivered by them to a warehouse at one of the auction markets. It is at this point that the operators are in competition with each other. They seek the patronage of the producers of tobacco through the facilities and services they have to offer. "Producers in the area generally desire and undertake to deliver their tobacco to the warehouses as soon as possible during each selling season in order to gain the advantages of warehouse insurance and protection and to secure sales during the time that best prices prevail." Stipulation, defendant appendix, pp. 20a–21a.

Sales of tobacco at the markets begin in late November, usually about the 25th, and continue until all of the tobacco in the area served by the market is sold. This generally takes from four to six weeks. The basket is the unit of measurement in the warehouse for sales purposes. A "basket" is a stack of tobacco which may not exceed five feet in height or contain more than seven hundred pounds. (KRS 248.390.) The United States government requires all tobacco to be inspected and graded before it is sold. (Sections 511 et seq., Title 7 U.S.C.) The United States Tobacco Inspection Service assigns to each market graders who are referred to as "sets" of graders. The buying companies assign buyers to each market. One such buyer from each of the companies buying tobacco on a maket is known as a "set" of buyers. During the seasons 1961–62 and 1962–63, two sets of graders and two sets of buyers were assigned to the Glasgow market.

"The amount of tobacco that can be sold on one market in a day depends ultimately on the capacity of the processing machinery located within convenient range of the market. After tobacco has been removed from the sales floor, it must first be sorted and cleaned, the moisture content must be precisely regulated, the stems must be removed, all in preparation for compressing the leaf into hogsheads for further curing and storing. Since the buying companies have only limited space for storage of the tobacco in loose-leaf form, these processes must be carried out shortly after it is purchased." Opinion trial judge, 223 F.Supp. p. 741. For these reasons the two sets of graders and buyers on the Glasgow market will not grade and buy more than 2520 baskets per day.

1. "A Tobacco Board of Trade shall be organized on every market at which tobacco is offered for sale at auction and each board shall have the objects, purposes, and powers to: promote a more orderly market for the sale of tobacco at auction; prevent market gluts by arranging for a more orderly flow of tobacco through the warehouses; encourage ethical practices in the auction system; support the continuation of the production control program; adopt bylaws or regulations defining voting rights of the tobacco board of trade members; collect dues and initiation fees to cover the operating expenses of the tobacco board of trade; adopt regulations for the conduct of the tobacco market including the allocation of selling time and selling space."

Consequently, it has been determined that the sales capacity of the Glasgow market is limited to 2520 baskets per day, or 1260 baskets per set of graders and buyers. Section 248.370 KRS provides that the rate of sales shall not exceed 360 baskets per hour and that the operating day of every warehouse shall be limited to five hours. At the maximum rate of sales per hour, with two sets of graders and buyers, 2520 baskets can be sold in three and one-half hours. This means that a basket is sold every ten seconds. The duration of sales per day is usually three and one-half hours and is set on a beltwide basis by the Burley Auction Warehouse Association. The market has no control over these restrictions, and, as heretofore indicated, they are not in issue here.

Given this method of selling, which is a product of certain natural and economic forces, accepted by the parties hereto, the crucial element in tobacco sales on a market is the selling time allocated to each warehouse. KRS 248.015 [2] authorizes a tobacco board of trade to adopt regulations for the conduct of the market including the allocation of selling time and selling space. KRS 248.035 requires that every warehouse offering tobacco for sale at auction must be a member of its local board of trade and membership in good standing is a condition precedent to the business of operating a tobacco warehouse. The defendant had adopted a by-law requiring each member of the Glasgow Board of Trade to conform to and observe all rules, regulations and by-laws of the corporation.

On November 1, 1961, the defendant adopted a resolution providing for the allocation of selling time and selling space among the warehouses then doing business on the Glasgow market. At this time and until the entry of the plaintiff, hereinafter described, there were ten warehouses in the Glasgow market, the operators of which were all members of the Glasgow Tobacco Board of Trade.

Article I of this resolution allocated selling time and space among the warehouses, on the basis of the proportion that the floor space of each warehouse bore to the total available floor space. Article II,[3] as amended prior to the opening of the 1961–62 season, limited new warehouses and new additions to existing warehouses to twenty percent of the selling time and space to which they would otherwise be entitled under Article I. Each succeeding year the new warehouse or new addition was to receive an additional allocation of twenty percent until its total available floor space was allocated. It is this regulation that is challenged by plaintiff's action.

On Monday, April 22, 1963, plaintiff and his counsel met with the members of the Glasgow Tobacco Board of Trade

2. See Footnote 1.

3. "Article II: Any new warehouse or warehouses, or any new additions to any warehouse or warehouses, or additional sales space which may have been built, completed, remodeled, and ready for use after the close of any sales season and before the opening of the next sales season will be allotted for the first sale season after completion 20% of the number of baskets which the added floor space will provide, excluding allowance for driveways. Such allocation will be 20% of the total basket space available in the new or added or approved floor space for the next ensuing sale season, and the number of such additional baskets allotted for each succeeding year to be added to the previous allocation for each of the next four (4) years shall be the same as the number determined and allocated for the first year of such allocation. For clarity, with respect to additional floor space constructed by any of the warehouses now operating which additions have been or may be constructed subsequent to the 1960–61 sales season, there shall be added to the base number of baskets allocated to such warehouse as set forth in Article I herein 20% of the total basket space of the new addition for each year until 100% of the total basket space of the new addition is allocated to such warehouse and added to its present base allocation as set forth in Article I herein. The same basis of allocation of baskets shall be applied to any new warehouse which may be constructed subsequent to the date of the passage of this resolution."

and informed them of plaintiff's intention to build a new warehouse on the Glasgow market. They requested an allocation of selling time and space for the 1963–64 season in the proportion that the floor space of his new warehouse would bear to the total available floor space, including his new warehouse, on the Glasgow market. Plaintiff offered to become a member of defendant corporation and to abide by all of the regulations, except the amended Article II. On May 28, 1963, plaintiff formally repeated his request by letter. This request was denied and plaintiff was informed that Article II would be enforced for the 1963–64 and subsequent selling seasons. With this knowledge in mind, plaintiff built a new warehouse which was ready for operation for the 1963–64 season.

Plaintiff's new modern warehouse, with adequate facilities in every respect, contained about 250,000 square feet of selling space. It was appraised at $500,000 by representatives of the Owensboro National Bank, and the plaintiff borrowed $350,000 for its construction. Of this loan $140,000 was borrowed from the Owensboro National Bank and $210,000 from the Small Business Administration. Half of the bank loan, with interest at six percent, was payable on demand. The remaining $70,000 of the bank loan, with interest at six percent, was payable in ten equal annual installments. The Small Business Administration loan was repayable in ten equal annual installments, with interest at four and one-half percent. Plaintiff's commitments for the first year were: interest $17,850 and minimum principal payments $28,000 for a total of $45,850.

Plaintiff's warehouse was the first completely new warehouse to be built since 1956. Two existing warehouses built 46,495 square feet of additional space in 1961. This space was subjected to the limitation of Article II as amended.

With the plaintiff's new warehouse, the total available space on the Glasgow market for the selling season of 1963–64 was 991,624 square feet. Under the twenty percent provision of Article II, only 773,046 square feet was considered as qualified space. Under the defendant's regulation, the plaintiff would have been allocated selling time in the proportion that twenty percent of his total space, or 50,000 square feet would bear to the total qualified space of 773,046 square feet. This would amount to approximately 6.77 percent of the total selling time for the first season. Without the limitation of Article II, the plaintiff would be entitled to selling time in the proportion that 250,000 square feet bears to the total space of 991,624 square feet, or approximately twenty-five percent of the selling time. Under the defendant's restrictive regulations, the plaintiff's commissions for the first year could not have exceeded more than $35,000 or $36,000.

The marketing of tobacco by auction is a method of marketing peculiar to the crop of burley tobacco, the principal money crop of the Kentucky farmer. These markets grew up over the years and certain customs, practices and usages became established. In later years, the legislature recognized these markets and wisely enacted legislation for the organization and operation of them to the end that the product could be processed and marketed in an orderly way, with fairness to the producer, the warehouse operator and the buyer. (Sections 248.010–248.990 KRS.)

The question presented here is whether the restraint imposed by Article II[4] of defendant's resolution of November 1, 1961, is an unreasonable restraint of trade, in violation of the Sherman Act. (Section 1, Title 15 U.S.C.)[5]

It should be noted here that we are not concerned with a statute passed by the Kentucky legislature, but rather with

4. See Footnote 3.

5. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

a regulation adopted by the defendant in pursuance of the statute. The argument, therefore, that the Sherman Act does not restrain state action, as decided in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, is not applicable to the facts of this case. It is claimed on behalf of the defendant that the tobacco auction warehouse business is a unique business and that because of certain limitations imposed on the warehouse operators, over which they have no control, the restraint here involved limiting the selling time of new warehouse operators is reasonable. In support of the restraint imposed herein as being a reasonable one, it is argued: that one with large financial resources, either cash or credit, can enter the market with a large warehouse and commandeer the limited selling time of the market to the point of usurping the rights of established businesses and eliminating them from the market; that the inevitable consequence of putting no restraint on new building operators is the destruction of competition rather than its preservation; and that the market should be given an opportunity to assimilate the shock of additional space in order to minimize as much as possible the injurious effects of such new buildings.

In Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, the Court read into the Sherman Act the "rule of reason"; that is, unless the restraint complained of unreasonably restrained trade or commerce among the several states, there could be no violation of the Act, except in those cases of per se violations,[6] not here applicable. That rule has been consistently followed. Whether or not a restraint is reasonable is a question of fact. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683; White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696,

9 L.Ed.2d 738. In Sugar Institute v. United States, 297 U.S. 553, at page 600, 56 S.Ct. 629, at page 643, 80 L.Ed. 859, the Court said of the Sherman Act: "Thus in applying its broad prohibitions, each case demands a close scrutiny of its own facts. Questions of reasonableness are necessarily questions of relation and degree."

In the Chicago Board of Trade case, the Court said, 246 U.S. at p. 238, 38 S.Ct. at p. 244: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." The Court said further: "To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." We must, therefore, look to the facts of this case to determine whether the restriction imposed by Article II of defendant's resolution was unreasonable.

Here the plaintiff or any new entrant into the Glasgow market, or an existing member who might wish to enlarge his business, is prevented from utilizing his full investment for five years. Only twenty percent of it can be effectively used for the first year. This limitation on the fruitful use of a new investment would in the natural course of events discourage new investors rather than encourage them. It is pointed out that under the facts of the plaintiff's investment, due to borrowed capital, that he could not hope to meet his commitments for interest and principal the first year. On the other hand, it is contended on be-

---

6. Cf. United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (price fixing); Klor's, Inc. v. Broadway Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (group boycotts); and

United States v. Addyston Pipe & Steel Co., 85 F. 271, C.A. 6, aff'd 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (division of markets).

half of the defendant that with a valuation of $350,000, alleged without proof to be more nearly the real value of plaintiff's investment, under the twenty percent rule the anticipated profits for the first year would gross 10.7 percent profit. We do not think either of these calculations is determinative of the question presented here.

■ As stated by the trial judge: "The regulation allotting selling time in accordance with only twenty percent of the new construction makes it problematical whether the addition to the market can be economically feasible." It is not the purpose of the Sherman Act to guarantee an investor a profit but it is concerned that he not be handicapped by unnatural market restraints.

■ We are of the opinion that the purpose and intent of the twenty percent rule was to preserve the status quo and suppress competition. Under the rule, the plaintiff was denied equality of opportunity to compete with the other warehouse operators for the business of the market. A substantial part of the market was foreclosed to him for the first years of his entry into the market. See International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; American Federation of Tobacco Growers v. Neal, 183 F.2d 869, C.A. 4; Gamco, Inc. v. Providence Fruit & Produce Building, Inc., 194 F.2d 484, C.A. 1.

Reference has been made to Wilson v. Shelbyville Tobacco Board of Trade, Eastern District of Kentucky, No. 174 on the Frankfort Docket. The district judge in this case had knowledge of that case but commented that it was dismissed by agreement of the parties and that he did not know what the real basis of the controversy over the resolution in question may have been. Counsel for the Carrollton Tobacco Board of Trade in their brief amicus curiae and appendix thereto have set forth the record of this case at great length, together with a purported summary of the evidence taken before the trial judge on a motion for preliminary injunction. There is no published opinion in this case, the record is not before us, and we do not take judicial notice of cases on the dockets of District Courts.

The district judge who decided the case now before us was not bound to follow the decision of his associate district judge, nor is it authority for us, except as the judge's reasoning might be persuasive. Since we are not favored with a written opinion of the trial judge, we do not know what the specific facts of that case were which moved him to decide as he allegedly did.

Counsel for the Carrollton Board in their amicus curiae brief have cited several district court cases [7] in which restrictions have been found to be reasonable. It is claimed that Judge Swinford in deciding this case is out of step with his fellow district judges. Each of these cases, while having some facts in common with the case at bar, dealt with a restriction unlike the one before this Court. Other cases, [8] cited on behalf of defendant are not in point for the same reason. Nor are cases [9] cited by plaintiff

---

7. Robertson et al. v. Henderson (N.C.) Tobacco Board of Trade et al., U.S. Dist.Ct. for E.Dist. of N.C., Civil Action No. 342; Danville Tobacco Ass'n v. Bryant-Buchner Assoc., Inc., U.S.Dist.Ct. for W.Dist. of Va., Civil Action No. 518 (affirmed in part only 333 F.2d 202, C.A. 4); Winn Ave. Warehouse, Inc. v. Winchester Tobacco Warehouse, Inc., et al., E.D.Ky., 220 F.Supp. 741 (on appeal to this Court, decision rendered this same day, 339 F.2d 277); and Roberts et ux. v. Fuquay-Varina Tobacco Board of Trade, et al., D.C., 220 F.Supp. 608, 223 F.Supp. 212.

8. Rogers v. Douglas Tobacco Board of Trade, 244 F.2d 471, C.A. 5, 266 F.2d 636, C.A. 5; and Asheville Tobacco Board of Trade, Inc. v. F.T.C., 263 F.2d 502, C.A. 4.

9. American Federation of Tobacco Growers v. Neal, 183 F.2d 869, C.A. 4; Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 194 F.2d 484, C.A. 1; American Tobacco Co. v. United States, 147 F.2d 93, C.A. 6, aff'd 328 U.S. 781, 66 S.Ct. 1125,

dispositive of this matter, for they deal with the total exclusion from markets, monopolization of markets, or the abuse of monopoly power. As heretofore stated, the question of whether a restraint is reasonable or unreasonable depends on the particular facts of each case. As stated in the Sugar Institute case, supra, "each case demands a close scrutiny of its own facts." The restriction in each case must be viewed in the light of all the facts and circumstances surrounding that case.

▪▪ The issue presented to the trial judge was a question of fact. He found that the conduct of the members of the Glasgow Board in adopting Article II of the resolution in question constituted an unreasonable restraint of trade. This conclusion drawn from the undisputed facts, in our opinion, is correct and not clearly erroneous. The function of the courts is not to formulate reasonable restraints of trade, but to enjoin the enforcement of those restraints that unreasonably restrain trade. The scope of this Court's review is limited to determining whether the trial judge's findings of fact, including the inferences drawn from undisputed facts, are clearly erroneous. Rule 52, Federal Rules of Civil Procedure; Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

By the judgment of the District Court, the defendant was "enjoined from enforcing against the plaintiff a system of allotting selling time which provides that only 20% of his floor space will be taken into account in the allocation during the first year with increments thereto of 20% as to subsequent years." The defendant was "further enjoined from conducting any system of allotting selling time that discriminates against the plaintiff's warehouse on the sole ground that he is a new warehouse operator on the Glasgow market." This judgment was

90 L.Ed. 1575; United States v. Aluminum Co. of America, 148 F.2d 416, C.A. 2; International Salt Co. v. United

conditioned on the plaintiff's performance of all conditions imposed by the laws of the Commonwealth of Kentucky.

Judgment of the District Court is affirmed.

States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20; and United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236.