**WINN AVENUE WAREHOUSE, INC.,**
Plaintiff-Appellant

v.

**WINCHESTER TOBACCO WAREHOUSE CO., Inc., The Burley House, Inc., P. O. Wilson, Ed Smith, Tom Jones and J. H. Waller, a partnership d/b/a The Farmers Warehouse, and The Winchester Tobacco Board of Trade, Defendants-Appellees.**

No. 15585.

United States Court of Appeals
Sixth Circuit.

Dec. 8, 1964.

278

Amos H. Eblen and Samuel Milner, Lexington, Ky., Eblen, Howard & Milner, Lexington, Ky., on brief, for appellant.

Jack F. Mattingly, Lexington, Ky., William B. Gess, Gess, Mattingly, Saunier & Atchison, Lexington, Ky., Marshall McCann, Jr., White, McCann & Stewart, J. Smith Hays, Winchester, Ky., on brief, for appellees.

Before CECIL and EDWARDS, Circuit Judges, and TAYLOR, District Judge.

CECIL, Circuit Judge.

This appeal involves an alleged violation of Sections 1 and 2 of the Sherman Act (Sections 1 and 2, Title 15, U.S.C.) in connection with the sale of tobacco at auction at the Winchester Market in Kentucky. Sales of tobacco on this market are regulated by Winchester Tobacco Board of Trade, a nonprofit-nonstock corporation, created in 1952 under the statutory law of Kentucky. The method of doing business and of conducting sales at the Winchester Market was substantially the same as at the Glasgow Market. Both markets were subjected to the same statutory law of Kentucky (Sections 248.010–248.990 KRS) and the same governmental restrictions (Sections 511 et seq., Title 7 U.S.C.). See opinion in Bale v. Glasgow Tobacco Board of Trade, Inc., 6 Cir., 339 F.2d 281.

During the 1960–61 marketing season and for a number of seasons prior thereto, four warehouses were independently operated on the Winchester Market. Three of these warehouses, Winn Avenue Warehouse, Inc., Winchester Tobacco Warehouse Company, Inc., and The Burley House, Inc., were operated as corporations organized under the laws of Kentucky, with their principal places of business in Winchester, Clark County, Kentucky. The other warehouse was operated by P. O. Wilson, Ed Smith, Tom Jones and J. H. Waller, as a partnership, under the name of The Farmers Warehouse. These first three warehouses and the corporations operating them will be referred to hereinafter as Winn, Winchester and Burley, respectively. Farmers will be understood to mean The Farmers Warehouse and its individual operators. Winchester Tobacco Board of Trade will be referred to as Board of Trade.

The action now before us on appeal was brought in the United States District Court for the Eastern District of Kentucky, by Winn, the appellant herein, against the other three warehouses and the Board of Trade. The plaintiff charged the defendants-appellees with entering into an agreement and conspiracy to injure and destroy it as a competitor in the sale of tobacco in the Winchester Market, in violation of Sections 1 and 2 of the Sherman Act.[1] The plaintiff sought injunctive relief and treble damages in the amount of $271,774.98. Jurisdiction of the court was invoked under Sections 15 and 26, Title 15 U.S.C. and Section 1337, Title 28, U.S.C. The case was tried to the court without the intervention of a jury and upon consideration of the evidence and the briefs of counsel, the trial judge granted judgment to the defendants.

1. "Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *
"Section 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

On April 7, 1961, Winchester and Farmers leased Burley, together with a certain quantity of tobacco baskets and certain office equipment, for a period of ten years, at a yearly rental of $22,500. The lease contained a stipulation between the lessees that of the 1680 baskets allotted to Burley, for sales under existing rules of the Board of Trade, Winchester should be entitled to receive 1000 baskets so allotted, and Farmers should be entitled to receive the remaining 680 baskets. This division of baskets was for the first round of sales based on the Board of Trade's 50% rule, hereinafter explained. Burley's total basket capacity of 3359 was thus divided between the lessees, 2000 to Winchester and 1359 to Farmers. There was a further provision in the lease that the lessor would not construct or promote the construction of a new tobacco sales warehouse in Clark County, Kentucky, during the term of the lease.

Winn resigned from the Board of Trade on April 18, 1961. Thomason, sole owner of Winn, gave as his reason for resigning that after the lease he would be outnumbered on the Board three to one. The Board of Trade functioned through a board of five directors, one from each of the warehouses and one representing the buyers.

At the time this action arose, the basket capacities of the four warehouses at Winchester were: Farmers 6941, Winchester 4116, Burley 3359 and Winn 2869. Basket capacity of these warehouses was determined by dividing the total number of square feet of selling area in each warehouse by thirty. Thirty square feet was fixed as the necessary space for each basket for sales purposes. The allotment of basket space was synonymous with the allotment of selling time.

As in the Glasgow case, supra, the Winchester market was restricted to a selling day of three and one-half hours and a sales maximum of 360 baskets per hour. One set of graders and one set of buyers was assigned to this market which resulted in a maximum daily sales of 1260 baskets. Selling time in hours, per round of sales for each warehouse, was determined by dividing its basket allotment per round of sales by 360. When the number of baskets allotted to a warehouse per round of sales was sold, or it had no tobacco left for sale, the sale moved on to the next warehouse in the order of rotation of sales among the warehouses.

By agreement of the operators of the warehouses on the Winchester Market, a plan of rotation of sales was followed whereby the warehouse that was first one year would be fourth the next year and each one would move up one notch. In this way, each warehouse would occupy each position, from one to four, once every four years. In the 1960–61 season and for several years prior thereto, by agreement of the warehouse operators, sales at the respective warehouses were made on a basis of 50% of capacity. This meant that in a given year the warehouse in No. 1 position in the order of rotation would sell 50% of its capacity in the first round of sales. This would continue in the order of rotation through No. 4 and then back to No. 1 for the balance of its capacity, or for such amount of tobacco as might be unsold.

Sometime before April 19, 1961, the Secretary of the Board of Trade was requested by the President to call a meeting of the Directors for April 19th. The meeting was attended by representatives of Farmers, Winchester and Burley, together with the attorney for and the secretary of the Board of Trade. At this meeting, a motion was adopted which provided in effect that the basket space allotted to Burley could be transferred to Farmers and Winchester and that such transferred basket space could be used by Farmers and Winchester for tobacco sales. Another motion adopted at the meeting provided that for the 1961–62 season the selling of 50% of the total basket-space allotment for each warehouse be reduced to 30% of the total basket-space allotment for each warehouse on each rotation of sales.

These two actions are the basis of Winn's complaint that the defendants en-

tered into a conspiracy to injure and destroy it as a competitor in the sale of tobacco at auction on the Winchester Market. Mr. Thomason, owner of Winn, testified that it was these actions and a combination of things to which he objected. Other complaints were that Winchester, being the smaller of the two lessees, got the larger share of Burley's basket allotment and that the lessees employed Burley personnel.

It appears from the evidence that Mr. Thomason negotiated for the purchase or lease of Burley in 1959 and that when a lease was prepared he rejected it. Mr. Thomason conceded that Winchester and Farmers had a perfect right to lease and operate Burley, but he objected to them getting the selling time of Burley. We understand from the evidence that for the season in question, 1961–62, the order of rotation for the opening of sales, but for the lease, was Farmers, Winchester, Burley and Winn. Under the 50% rule, 7208 baskets could have been sold before any sales would have been made at Winn. With the 30% rule in effect, a maximum of only 4325 baskets could have been sold before the sales reached Winn. The transfer of Burley's baskets to Winchester and Farmers did not put those baskets ahead of Winn. With Burley in third place and Winn in fourth place, Burley's baskets were already ahead of Winn.

The reduction of the 50% rule had been discussed for several years. It had been the consensus of opinion of members of the Board of Trade that, in fairness to the smaller warehouses, a reduction should not be put into effect until Farmers, the largest warehouse, was in first position. This year then was the appropriate time to make the change, in the light of previous discussions. The evidence further shows that Winn was given several opportunities to share, in varying amounts, the basket allotment of Burley. He declined all of these offers.

Farmers employed Farris, President of Burley, and Pasley, a former employee of Burley. Winchester employed Fox,

Evans and Stephenson of Burley's personnel. Other key personnel of Burley were not employed by either Farmers or Winchester, and Winn did not choose to employ them. We attach no particular significance to the evidence that Winn made more in commissions in the 1961–62 season than it did any of the previous eight years and that it made more than it did the last time it was in fourth position. This increase in commissions must be viewed in the light of the increased crop of tobacco for the year 1961.

■ Upon a careful consideration of the record in this case, we are impelled to the conclusion that there is no merit to appellant's claims. The charge that Section 1 of the Sherman Act was violated must rest upon a contract, combination or conspiracy, between the appellees, or some of them, to restrain trade to the injury of the appellant or the public. We find no evidence to support the claim that the appellees, or any of them, entered into any agreement, combination or conspiracy to injure the appellant or the public in any way in the conduct of appellant's business. Nor is there any evidence of conduct on the part of the appellees from which such a conspiracy or combination could be inferred.

■ There is no significance to appellant's argument concerning relative market area, for the reason that we conclude there is no unreasonable restraint of trade no matter what the market area affected. Under the rule of reason announced by the Supreme Court in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, only an unreasonable restraint of trade is a violation of Section 1 of the Sherman Act. Whether a restraint is unreasonable or whether there is any restraint is a question of fact. Board of Trade of City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S. Ct. 872, 97 L.Ed. 1277.

The appellant failed to show that the leasing of Burley space by the two lessee warehouses restrained trade in any way. Neither is it shown that the appellees acted to restrain the appellant from competing effectively with them, or to prevent a new entrant from entering competition in the Winchester Market. The appellant cannot expect to have competition remain static, nor does the Sherman Act require it. This would violate the natural laws of competition. Unless it is shown that the appellees used their size to intentionally restrict competition or to intentionally force others out, there is no violation of the Sherman Act. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872.

Further, the appellant failed to show that the reduction of selling time from 50% to 30% on each round of sales was a violation of the Sherman Act. The Board of Trade, as organized under the statutory law of Kentucky, was authorized to apportion selling time among its members. No abuse of this power is shown. As a matter of fact, it would appear that the new rule would enable Winchester to compete more effectively with the neighboring markets. It should also benefit the smaller warehouse, since it would be selling more frequently.

Since we find that there is no unreasonable restraint of trade, there is no significance to the fact that a representative of Burley remained on the board of directors of the Board of Trade. Membership of tobacco boards of trade is regulated by the statutes of Kentucky and we have no control over who shall or shall not be members. (248.025 and 248.035 KRS.)

Appellant's claim of monopoly, in violation of Section 2 of the Sherman Act, is equally without support. As we have stated, competition was not lessened and no one was forced out or excluded from the market. The appellant had the same proportionate share of the total basket space after the lease as he had before. He had an opportunity to share in the lease and he was free to expand his own warehouse. Other entrants were free to enter the market so far as any restraining influence of the lease was concerned. A monopoly violation presupposes exclusive possession or control by an individual or conspiracy, or the means and practices by which, if attempted, the individual or conspiracy could gain exclusive possession or control of a market or product to the exclusion of other actual or potential competitors from that market or product. See American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. No such exclusive control existed here by reason of the lease.

We conclude that the legal conclusions of the trial judge are correct and that his findings of fact are supported by the evidence and are not clearly erroneous. Rule 52, Federal Rules of Civil Procedure; Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

Judgment of the District Court is affirmed.