BANK OF UTAH, a Utah Corporation, and Bank of Ben Lomond, a Utah Corporation, Appellants,

v.

COMMERCIAL SECURITY BANK, a Utah Corporation, Appellee.

No. 8459.

United States Court of Appeals Tenth Circuit.

Nov. 14, 1966.

David S. Kunz, Ogden, Utah (Ronald N. Boyce, Salt Lake City, Utah, on brief), for appellants.

Richard Haas, San Francisco, Cal. (Neil R. Olmstead, Ogden, Utah, Moses Lasky, San Francisco, Cal., on brief), for appellee.

Before MURRAH, Chief Judge, SETH, Circuit Judge, and CHILSON, District Judge.

MURRAH, Chief Judge.

At issue in this case is whether appellee Commercial Security Bank's contracts to supply the Ogden City and Weber County, Utah, School Boards with the "no-check" payroll service violate Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1, 2.[1] Appellants Bank of Utah and Bank of Ben Lomond sued Commercial Security alleging the contracts constituted an unlawful restraint under § 1 and an attempt to monopolize under § 2 and seeking treble damage and injunctive relief. Commercial Security counterclaimed alleging tortious interference with its contract to perform the "no-check" service for an Ogden hospital. After trial to the court, the complaint was dismissed and Commercial Security awarded $7251.22 on its counterclaim. From this judgment the Bank of Utah and Bank of Ben Lomond appeal.

Within appellants' trading area, which was described as including Weber County[2] and parts of surrounding counties, at least eight commercial banks do business. Four of these banks are located in Ogden; their total resources on April 15, 1964, (the date closest to trial for which figures are available in the record) were approximately as follows: Bank of Utah—$16 million, Bank of Ben Lomond—$3 million, Commercial Security Bank—$50 million, and First Security Bank (a statewide chain)—$350 million.

In order to reduce the costs and simplify the process of handling their payrolls, the Ogden Board in 1961 and the Weber Board in 1963 requested area banks to submit proposals for the performance of payroll services. · Appellee and First Security Bank submitted bids to both boards; appellant Bank of Utah submitted a bid to the Weber Board. In both cases the bid of appellee was accepted. Contracts terminable at the will of either party were executed, under which the "no-check" service is provided in return for a fixed monthly charge.[3]

Briefly the "no-check" payroll plan operates as follows: the bank computes the payroll from basic earnings and deductions data provided it by the board. The board issues to the bank one check in the amount of the total net payroll due. The bank in turn credits the net wages due each employee to special checking accounts[4] set up with the bank in the name of each employee. Finally, the bank sends the employee a monthly statement showing gross pay, deductions, and the net pay deposited to his special account. The bank also prepares various other documents, such as social security and withholding tax forms.

A critical aspect of the plan is that each employee can make deposits to and write two free checks per month on his special account without charge. Moreover, although not provided for by the contracts, Commercial Security agreed at the behest of appellants to a second procedure by which an employee may have funds in his account with Commercial Security automatically transferred to either of appellants. Because of these features of the plan the court found that no employee was required to maintain

---

1. 15 U.S.C. § 1. "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal * * *."
   15 U.S.C. § 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *."

2. The city of Ogden is located in Weber County, Utah.

3. In accordance with general banking practice the Ogden banks give earnings credits to checking account customers based on the average monthly balance in the ac-count. Both boards have maintained checking accounts with Commercial Security and applied the earnings credit against the "no-check" service charge. The court found that these checking accounts were voluntarily maintained, and that either board could at any time withdraw its funds from the checking account and pay in cash the "no-check" service charge.

4. Employees paid under the "no-check" plan were requested by the boards to execute the documents necessary to set up the special accounts. There was no evidence that any board employee objected to this request. In any event the court found that the employees voluntarily agreed to having the special accounts.

funds on deposit with appellee; that an employee could transfer funds without charge; that the employees were aware of this right; and that many did in fact transfer their salaries from Commercial Security to other banks.

In his exhaustive opinion the trial court concluded that "The setting up of special accounts, when coupled with two free checks to withdraw the funds and the provision for automatic transfer of the funds to other banks, is a reasonable procedure * * *" and not an unreasonable restraint of trade.[5] On the attempt to monopolize charge, the court concluded there was a failure to prove a specific intent to gain market control illegally. Finally, the court concluded on the counterclaim that because of statements made by officers of appellants to the hospital administrator, the "* * * plaintiffs are liable for tortiously inducing the breach of the hospital's contract with defendant Bank."

At the outset, Commercial Security denies that the trial court had jurisdiction of the subject matter under the Sherman Act for the reason that the "no-check" service is neither in nor affects commerce. Indeed, it argues that the trial court so concluded in its finding of fact 20. But, finding 20 merely states that the several paragraphs in appellants' complaint setting out the elements necessary to state a claim under sections 1 and 2 of the Act are "untrue". It is not a finding that jurisdiction is lacking, but rather a general finding that the elements necessary to support a Sherman Act claim were not proven.

We think the requisite connection with interstate commerce is present. It is true the transactions here complained of were intrastate, indeed intracounty, i. e. crediting individual checking accounts in an Ogden bank with funds transmitted to it by the Ogden City and Weber County School Boards.[6] And, it is irrelevant that some of a bank's activities are in interstate commerce if those complained of are not. United States v. Yellow Cab Co., et al., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Page v. Work, 9 Cir., 290 F.2d 323; Lieberthal v. North Country Lanes, Inc., 2 Cir., 332 F.2d 269. However, the jurisdictional nexus with interstate commerce may also be demonstrated by a showing that the wholly intrastate activities had a substantial effect on interstate commerce. United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290; United States v. Shubert, 348 U.S. 222, 75 S. Ct. 277, 99 L.Ed. 279; United States v. Employing Plasterers Association, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618. The average monthly payroll transmitted to Commercial Security under the two contracts was $565,000. Evidence is lacking as to how much of this money would have been deposited in Commercial Security in the absence of the "no-check" plan, and how much was transferred to other banks by free checks and automatic transfer. But, it would be unrealistic to say that Commercial Security did not realize some net increase in deposits and appellants some net decrease, with a corresponding effect on

5. The court was also impressed with the competitive nature of the plan. "I see no reason why banks should not expand upon the use of modern computers and perform payroll accounting services for customer employers. There is nothing inherently wrong or questionable for banks to render such service. Plaintiff banks can, and have, offered the same type of service. They and other banks are completely free to compete with defendant in this field. Progress and the utilization of new instrumentalities and procedures are not prohibited by the Sherman Act * * * Defendant had to compete with plaintiffs and other banks in inaugurating the so-called no-check payroll plan in the Ogden area. It will have to compete with other banks, some larger and some smaller, for other contracts to perform payroll accounting services. Defendant in the past has competed with plaintiffs and other banks for checking account customers, and it will have to do so in the future."

6. Any check written on these special accounts to an out of state payee would move in interstate commerce; but the record is barren of proof that any such checks were written.

**24**

the funds available to the respective banks for their operations in the interstate financial markets in loans and securities. Interstate commerce was thus affected to some extent.

Commercial Security further contends that the Sherman Act is inapplicable here because the antitrust laws do not apply to contracts with governmental agencies acting in their official capacities. See E. W. Wiggins Airways v. Massachusetts Port Authority, 1 Cir., 362 F.2d 52; United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626; Eastern R. R. Presidents' Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464; Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. The record is barren of any mention of this issue of law at any stage of the trial proceedings. In light of this and of the decision we reach on the merits of appellants' contentions, we are not disposed to rule on the issue unless it is jurisdictional. Commercial Security does not contend nor do the cases seem to hold that jurisdiction is lacking when the complained of activities involve a governmental agency; instead they seem to hold the Act inapplicable and the complaint insufficient to state a claim on which relief can be granted, i. e. see E. W. Wiggins Airways v. Massachusetts Port Authority, supra. We pass then to a consideration of the merits.

■ Appellants broadly assert, " * * * the record demonstrates that the trial court made seriously erroneous findings of fact which are not supported by the evidence and which were induced by an erroneous view of the law." However, they complain of no specific finding. We must, therefore, assume that only the conclusory findings are in dispute and all supportive findings unchallenged. The court concluded that "The contracts * * * are not in restraint of trade and commerce, are reasonable, do not constitute a combination or conspiracy in restraint of trade or commerce, and do not constitute an attempt by defendant to monopolize any part of

trade or commerce." We will disturb this finding only if, despite evidence to support it, we are convinced from the whole record that a mistake has been committed. United States v. United States Gypsum, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

On the Section 1 issue it is noteworthy that appellants conceded below that " * * * there has been no per se violation of the antitrust act and we are relying on the rule of reason * * *." But, though they do not contend for a per se violation, they cite and rely upon per se case law. Two of the cases, i. e. Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 61 S. Ct. 703, 85 L.Ed. 949, and Klors, Inc. v. Broadway Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, involve group boycotting. The other case, Northern Pacific Railway v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545, involves a tying arrangement.

■ There is no boycott in this case; nor can the contracts be said to effect a legally enforceable tying agreement; nor is the evidence sufficient to justify an inference that the plan embodied in the contracts unduly deterred the Board employees from utilizing their two free methods of transferring their salaries to banks of their choice. Surely Commercial Security is not per se forbidden to utilize improved business methods and techniques wrought by technological innovations to encourage, even entice, the employees to leave their salaries on deposit, so long as they are not directly or indirectly coerced to do so. Cf. Atlantic Refining Co. v. Federal Trade Commission, 381 U.S. 357, 371, 85 S.Ct. 1498, 14 L.Ed.2d 443, where Atlantic marshalled its full economic power to force its dealers and wholesalers to buy Goodyear products.

■ We come then to the consideration of the rule of reason, for although no per se violation is shown, " * * * the contracts may yet be banned by Section 1 if unreasonable restraint was either their object or effect." See Times-Picayune Pub. Co. v. United States, 345

U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277. The question is whether the restraint involved in having to take some affirmative action to transfer funds from Commercial Security to the bank of the employee's choice is unreasonable. "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683; and see White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738; Winn Avenue Warehouse, Inc. v. Winchester Tobacco Warehouse Co., 6 Cir., 339 F.2d 277; Cf. Bale v. Glasgow Board of Trade, Inc., 6 Cir., 339 F.2d 281. We think the trial court's application of the rule of reason is clearly correct.

Appellants point to the following evidence which they argue the trial court did not give sufficient consideration: statistical data showing that after the "no-check" plan was effectuated, their growth rate decreased and Commercial Security's increased;[7] testimony of three teachers that they dropped their checking accounts with appellants because of the inconvenience of maintaining two accounts; testimony of bankers that the deposit of the payroll check is the key to retention of the checking account, and that retention of the checking account is crucial to selling other bank services to that customer; and testimony of Commercial Security officers that they hope to extend the plan to other large employers. They further contend but point to no evidence that they are cut off from attracting new school teachers as customers.

The burden of appellants' argument is that because of the inconvenience in maintaining two accounts referred to by the three teachers, the "no-check" plan has caused the changes in growth rate demonstrated by the statistical data. This effect, they argue, will be multiplied in the future by their inability to "cross-sell" other bank services to lost checking account customers, by their inability to attract new teacher accounts, and by Commercial Security's admitted intention to expand the plan to other employers.

We cannot accept appellants' contentions for the principal reason that the causal connection between the plan and the effects allegedly brought about is

| 7. Average yearly % growth of total deposits | C.S. | B.U. | B.B.L. |
|---|---|---|---|
| 1954–1961 | 5.66% | 9.71% | —— |
| 1961–1964 | 8.54% | 6.53% | —— |
| Average yearly % growth of demand deposits only | | | |
| 1954–1961 | 5.45% | 8.06% | —— |
| 1961–1964 | 5.69% | 0.36% | —— |
| No. checking accounts of all types | | | |
| 1960 | 10,802 | 8,081 | 1,991 |
| 1961 | 12,158 | 8,371 | 2,194 |
| 1962 | 12,098 | 8,356 | 2,149 |
| 1963 | 12,680 | 8,079 | 2,144 |

Other charts were received reflecting changes in total deposits and in demand deposits only for the period October, 1963–October, 1964, as compared with the previous year. We do not regard these charts as sufficiently representative to be of any probative value in determining the effect of the plan.

simply too tenuous. In the first place, the increase in the rate of growth of Commercial Security's total deposits after 1961 can be explained by its opening of a new main office and a new branch office during that period. Second, while the decrease in the rate of growth of Bank of Utah's demand deposits after 1961 is striking, the fact that the rate stays almost constant for Commercial Security is equally striking. It is possible to infer from this data that Commercial Security's acquisition of checking account customers under the plan actually resulted in a comparatively small increase in the growth rate of its demand deposits, i. e. most of the "no-check" customers who originally banked elsewhere used one of the two free methods to withdraw their salary from Commercial Security. Finally, when we consider that data for First Security Bank, the largest in the Ogden area, is conspicuously absent from the statistics and that the only direct evidence that the plan decreased Bank of Utah's deposits is the testimony of three teachers, we cannot conclude that the effect of the plan condemns it.

The restraint here is minimal—the school board contracts were terminable at will; the boards voluntarily maintained funds on deposit with Commercial Security; the employees voluntarily agreed to have the special checking accounts; there are two free methods by which funds can be transferred from the special accounts (the effort involved in writing a personal check and depositing it in the bank of one's choice cannot be much greater than endorsing a paycheck and depositing it); and appellants are still free to solicit the patronage of the school board employees whose names and addresses are of public record. Absent definitive proof that the plan had an adverse effect on commercial banking in the Ogden area, we think that whatever restraint the plan produced is reasonable in light of the competitive manner in which the contracts were let; the opportunity available to appellants to compete in the future for payroll service con-

tracts and individual employee accounts, and the benefits to the boards, their employees and the public. We certainly cannot say the trial court's finding was clearly erroneous.

Appellants further contend that the trial court's opinion indicates he erroneously considered an intent to restrain trade an essential element of a Section 1 claim. Commercial Security concedes an intent to restrain trade has never been held a requisite to violation of Section 1, and the court's opinion does deal with the intent to restrain issue, concluding that the contracts were not " * * * entered into or done with the intent to do wrong to the general public and to restrain the free flow of commerce." Be that as it may, intent is relevant not because good intent will save otherwise objectionable arrangements, " * * * but because knowledge of intent may help the court to interpret facts and to predict consequences," especially where, as here, the very question is whether the transaction is reasonable. See Chicago Board of Trade v. United States, supra, 246 U.S. p. 238, 38 S.Ct. 242.

While intent to restrain trade is not essential to violation of Section 1 of the Act, it is clear that a specific intent to destroy competition or build monopoly is crucial to the charge of attempting to monopolize under Section 2. Times-Picayune Pub. Co. v. United States, 345 U.S. supra, 626, 73 S.Ct. 872; and see Union Carbide and Carbon Corp. v. Nisley, 10 Cir., 300 F.2d 561, 585–586. Appellants point to no evidence in contradiction of the court's finding that no such intent was here present, and we thus have no basis on which to hold the finding clearly erroneous. Indeed, the reasoning in the court's opinion that the presence of the two free methods for transferral of funds to other banks "negatives any claim of intent to monopolize" would seem to be clearly correct.

We now turn to appellants' claims relating to error in the conduct of the trial. They first complain of the

court's refusal to permit the witness Myrick to give his opinion on the average time depositors remain with a bank. The question was objected to as lacking a proper foundation. In ruling on the objection the court concluded by saying, " \* \* \* I don't think you can lay a foundation. Go ahead if you think you can, but until you do I won't permit you to ask the question, because I don't think it is material at this juncture or relevant \* \* \*." After some colloquy, appellants' counsel said, "I will not pursue the matter, Your Honor." It is thus apparent that appellants acceded to the ruling of the court and cannot now be heard to complain of his disposal of the objection.

Appellants next assert their exhibit 40 was erroneously excluded. This exhibit contained the answers of 36 of appellants' former customers to a series of questions, including where they presently bank and why they dropped their accounts with appellants. The questions were asked by a Bank of Utah employee. The 36 were alleged to be school board employees, and appellants offered to show by the exhibit that they decided to drop their accounts with appellants and bank exclusively with Commercial Security because of the inconvenience of maintaining two accounts. The exhibit was apparently excluded on grounds of hearsay.

As evidence of why these 36 people dropped their accounts with appellants, this exhibit was unquestionably hearsay and inadmissible. Appellants do not seem to dispute this, but instead seek to support the exhibit as a " \* \* \* survey relevant to establish the effect of the no check plan on the employees of employers who had accepted the appellee's program." Thus appellants contend that the responses of these 36 were representative of and admissible to show the effect of the plan on all school board and hospital employees under the plan.

In this regard the tendency is to admit the results of properly conducted surveys for whatever they are worth in spite of the hearsay difficulty. See Standard Oil Co. v. Standard Oil Co., 10 Cir., 252 F.2d 65, Anno. 76 A.L.R.2d 600, § 3; Zippo Manufacturing Co. v. Rogers Imports, Inc., D.C., 216 F.Supp. 670. The interviewee's response is viewed as not hearsay or as hearsay but within the present state of mind exception. See Zippo Manufacturing Co. v. Rogers Imports, Inc., supra. In this case, however, we do not even reach the hearsay question as it relates to the admissibility of surveys, for we think the trial court was well within the bounds of discretion in refusing to admit a poll conducted as was this one.

■■■ A survey is inadmissible when the sample is clearly not representative of the universe it is intended to reflect. See Hawley Products Co. v. United States Trunk Co., 1 Cir., 259 F.2d 69, 77; Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429;[8] Public Opinion Surveys as Evidence: The Pollsters Go to Court, 66 Harv.L.R. 498. Here the universe was either all school board and hospital employees under the plan, or at a minimum all school board employees under the plan. The sample

8. "Polls: Admissibility dependent on correct methodology

The offeror has the burden of establishing that a proffered poll was conducted in accordance with accepted principles of survey research, i. e., that the proper universe was examined, that a representative sample was drawn from that universe, and that the mode of questioning the interviewees was correct. He should be required to show that: the persons conducting the survey were recognized experts; the data gathered was accurately reported; the sample design, the ques-

tionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; the sample design and the interviews were conducted independently of the attorneys; and the interviewers, trained in this field, had no knowledge of the litigation or the purposes for which the survey was to be used. Normally this showing will be made through the testimony of the persons responsible for the various parts of the survey."

was chosen from neither of those groups but instead from those employees who at one time banked with appellants and later switched exclusively to Commercial Security. In fact the interviewer testified he originally interviewed 50 employees, but that 14 still had accounts with appellants and their responses were, therefore, deleted from the exhibit. Moreover, this deletion of part of the responses furnishes a second reason to exclude the exhibit on the ground it is self-serving. See Sears, Roebuck and Co. v. All States Life Insurance Co., 5 Cir., 246 F.2d 161, 171.

Appellants' last procedural claim is that the conduct of the trial court deprived them of a fair trial. They point to numerous portions of the record as evidence that the court examined witnesses, interrogated counsel on the issues, ruled inadmissible evidence to which no objection was made, and generally interfered with the presentation of and was critical of appellants' case. Without attempting a piecemeal evaluation of appellants' citations to the record we think that to the extent their charges have any validity, the court's actions are explained and justified by the nature of the case. This was an antitrust case tried without a jury. A federal judge is not a mere umpire; "He has both the responsibility of assuring the proper conduct of the trial and the power to bring out the facts of the case." Jordan v. United States, 10 Cir., 295 F.2d 355; and see Union Carbide and Carbon Corp. v. Nisley, supra, 300 F.2d 586; Ayash v. United States, 10 Cir., 352 F.2d 1009. An appraisal of the whole record leaves us with the impression that the questioning by the court of the witnesses and counsel was no more than was necessary to properly understand the matter presented (he was the trier of the facts), and to prevent the proceedings from straying to matters of little or no relevance.

We find nothing in the record so critical or abusive as to indicate bias requiring reversal. Union Carbide and Carbide Corp. v. Nisley, supra, 300 F.2d

586; Bowles v. Lentin, 7 Cir., 151 F.2d 615, 620. We conclude that appellants received a full and fair hearing on all relevant matter.

## THE COUNTERCLAIM

In order to reduce payroll costs St. Benedict's Hospital of Ogden also contracted with Commercial Security for the rendition of the "no-check" service. Bank of Utah officers made several statements to Sister Estelle, the hospital administrator, at least one of which was admittedly intended "to stop the plan".

Appellants first contend that Sister Estelle decided against implementation of the plan because of fear of bad publicity and not because of statements made by Bank of Utah officers; therefore, they argue the court's finding that appellants induced the breach is clearly erroneous. While fear of bad publicity may have motivated Sister Estelle, the statements made by appellants clearly produced that fear. Moreover, Sister Estelle testified that had it not been for her talks with Bank of Utah officers, "I would have gone on, because I saw no harm in it [the plan]." On this record we certainly cannot say the court's finding was clearly erroneous.

Appellants next argue that even if they caused the breach, they are not liable because their conduct was privileged. It is the law in Utah that one who persuades or conspires with another to breach a contract has committed an actionable tort unless the action is justified. Bunnell v. Bills, 13 Utah 2d 83, 368 P.2d 597; Gammon v. Federated Milk Producers Association, Inc., 11 Utah 2d 421, 360 P.2d 1018; and see Zellinger v. Uvalde Rock Asphalt Co., 10 Cir., 316 F.2d 47 and cases cited at p. 50. Appellants concede their action was not privileged on the theory that they are competitors of Commercial Security, see Restatement of Torts § 768(2). However, they do argue that their action was privileged as an effort to retain a prior contract or financial interest of

their own, i. e. their deposit contracts with hospital employees, Bunnell v. Bills, supra, 368 P.2d p. 602, citing Prosser on Torts, § 106, p. 737; see also Restatement of Torts, § 769.

Assuming that appellants had checking account contracts with a substantial number of hospital employees (there is no proof of this in the record), the contract rights referred to do not seem to be the type envisioned by Prosser or the Restatement. The authorities seem to refer to property or contract rights in the affairs of the person persuaded. Appellants' rights related only to the employees of the person persuaded. Moreover, the contract rights the appellants rely on have actually been performed; the only executory portion of those contracts is the appellants' duty to pay on demand. They have no contract right to future deposits.

Appellants cite several cases which we think are clearly distinguishable. Hooper v. Lennen and Mitchell, D.C., 52 F. Supp. 319, affmd. 146 F.2d 364, 161 A.L.R. 282, involved the privilege of one in a confidential relationship with the breaching party; Hendler v. Cuneo Eastern Press, Inc., 2 Cir., 279 F.2d 181, involved the privilege of a prior contractor to induce a subsequent contractor not to perform where both contracts were for precisely the same work; Hope Basket Co. v. Product Advancement Corp., 6 Cir., 187 F.2d 1008, upheld as privileged a patent licensee's inducement of other licensees not to pay royalties in order to bring about a class action to test the patent's validity. The latter case seems to be the strongest authority for appellants' position, yet even it is not persuasive for here the appellants are clearly not in the same class with bank depositors.

As a last resort appellants allege that in the interim since judgment was entered, the contract has been consummated and the damages caused by the breach recouped. The certainty of damages was a matter for proof at the trial. We cannot reverse the judgment of a court on the bald allegation made here that the tort in fact caused no damage. We consider only matters in the record.

The judgment is affirmed.