Fred J. BECKER, d/b/a Becker's Auto Glass, Plaintiff,

v.

SAFELITE GLASS CORPORATION, Inc., a corporation, et al., Defendants.

Civ. A. No. W-2951.

United States District Court
D. Kansas.

Aug. 18, 1965.

628

Vincent L. Bogart, and Harold Irwin, Wichita, Kan., for plaintiff.

Levand & Weil and Jochems, Sargent & Blaes, Wichita, Kan., for defendants.

WESLEY E. BROWN, District Judge.

This civil antitrust suit is currently before the court on defendants' motion for summary judgment; defendants' motion to dismiss pursuant to Fed.R.Civ.P. 41(b); defendants' motion for judgment for costs; and defendant Safelite's motion to dismiss under Federal Rule 37.

For convenience, the defendants will be referred to herein as follows:

Individual defendants: by name
Safelite Glass Corp.: "Safelite"
Service Auto Glass Co.: "Service" or "Service Auto"
The Auto Glass Co.: "Auto Glass"

To place these motions in proper perspective, a brief history of this piece of litigation is required. The suit was filed on August 8, 1963. On August 28, 1963, Safelite Glass Distributors, Inc., a named defendant, moved for summary judgment as to it. [See DOC #8]. The motion was continued on September 28, 1963 [DOC #17] and was sustained on September 3, 1964 [DOC ##51, 52]. Defendants Service Auto and Auto Glass moved to dismiss on August 28, 1963 for lack of jurisdiction; improper venue; failure to join indispensable parties; and failure to state a claim on which relief could be granted. [DOC #9]; this motion was denied without prejudice to later filing on January 29, 1964 [DOC #32]. Also on August 28, 1963, defendants moved for security for costs. [DOC #10].

On August 30, 1963, defendants were granted ten additional days in which to plead [DOC #11]; and on September 16, 1963 defendants moved for additional time in which to plead [DOC #15]. On September 28, 1963, the court extended the time in which to answer until fifteen days after the taking of a named individual's deposition. [DOC #18]. Plaintiff filed an amended complaint on October 29, 1963 [DOC #23], and the parties stipulated that defendants would have until fifteen days after the taking of the named individual's deposition in which to answer the amended complaint [DOC #28].

Defendants Lankin and Weil [DOC #35]; Service Auto and Auto Glass [DOC #36]; and Safelite [DOC #37] answered on March 18, 1964, and on April 10, 1964 the court ordered the case continued off the pretrial calendar. [DOC #45]. Plaintiff filed its first set of interrogatories on September 2, 1964 [DOC #50]; on September 14, 1964 the defendants were given until September 24 to answer the interrogatories [DOC #54] and the interrogatories were answered on that date [DOC #59].

The court entered an "Order Relating to Discovery Procedures" on September 3, 1964 (roughly six months after the case was at issue), in which the court ordered:

(a) all discovery was to be completed within ninety days;

(b) examination of books and records was to be completed within thirty days, and after that thirty day period the books and records of the parties were not to be available for that purpose;

(c) interrogatories could be answered by specific reference to appropriate books;

(d) if interrogatories were answered by reference to compiled lists and the like, such lists were to be made available;

(e) any books and records referred to in an answer to interrogatories were to be made available;

(f) "A pretrial order *shall* be filed in 90 days." (emphasis added) [DOC #51, 53].

On September 24, 1964 defendant Safelite filed its first set of Interrogatories on plaintiff [DOC #54], and Safelite filed its second set of Interrogatories on plaintiff on January 8, 1965 [DOC #74]. On December 14, 1964, plaintiff requested six months additional time in which to complete discovery, and also moved to bring in numerous additional parties defendant [DOC #70]. At that time, defendants orally moved for judgment under Fed.R.Civ.P. 37 on the basis of plaintiff's failure to answer interrogatories within the period prescribed by the Rules. The court overruled such motion pending a sixty day extension. [Tr. December 14, 1964 Hearing, p. 24, DOC #99].

The court extended the September 1964 extension order for sixty days and informed plaintiff and his counsel: "If you don't have your matters determined by that time I will entertain a motion to

dismiss. That is the order and ruling of the Court." [Tr. December 14, 1964 Hearing, p. 23 DOC #99]. The court further stated:

"As I explained to you before, out of an abundance of precaution to see that this plaintiff has his day in Court I am extending this matter for 60 days under the order that I made and I want you to prepare an order, and I want you to approve it, and I want it in here in this file, and I don't want to hear from any of you again about an extension of time in this case." [Tr. December 14, 1964 Hearing, pp. 29–30, DOC #99].

The December 14, 1964 proceedings were journalized on January 12, 1965 [DOC #78]. The order recited, inter alia, that plaintiff's motion to add additional parties defendant was overruled; that the period for the completion of all discovery was extended for sixty days; and that plaintiff was given time during the sixty day extension to answer the first set of interrogatories which had been filed on plaintiff September 24, 1964. The order concluded:

"On or before February 12, 1965, all discovery shall be completed and a pretrial order shall be submitted. In the event a pretrial order has not been submitted by that date the court will entertain a motion for dismissal of the action."

On January 27, 1965 [DOC #81], plaintiff filed its answers to defendant Safelite's *second* set of interrogatories in a form violative of Local Rule 14(d); and on February 2, 1965, defendant Safelite moved to compel answers or in the alternative for requested admissions [DOC #83]. Plaintiff objected to defendant's motion to compel answers on February 8, 1965 [DOC #88]. On February 8, 1965, plaintiff partially answered defendant Safelite's first set of interrogatories in proper form [DOC #87].

Also on February 8, 1965, defendant Safelite moved to dismiss pursuant to Fed.R.Civ.P. 37 [DOC #89]; this motion is currently pending. On February 10, 1965, plaintiff moved for still another extension of time for discovery and for the submission of a pretrial order [DOC #91], and moved to compel answers on February 23, 1965 [DOC #94]. All defendants moved to dismiss pursuant to Fed.R.Civ.P. 41(b) and for judgment for costs on February 26, 1965 [DOC #97]; this motion is currently pending.

On March 18, 1965 [DOC #102], the court ordered that further extensions for discovery would not be granted; and in order to ascertain whether plaintiff had any claims on which relief could be granted, the court set the case down for a "trial" to the court on 14, 15 and 16 April, 1965, at which time plaintiff was to submit all the evidence it had to sustain its various claims. Plaintiff was granted ten days in which to submit a proposed pretrial order, and counsel were to report to the court re any pre "trial" problems on April 5, 1965. [DOC #102].

On April 5, 1965 it appeared that plaintiff's attempts at a proposed pretrial order were totally unacceptable to defendants, and the court ruled that April 14, 1965 would be devoted to preparing a pretrial order narrowing the issues. [DOC #104].

Plaintiff then proceeded to serve subpoenas duces tecum on numerous individuals and firms to appear April 15, 1965 and to produce voluminous records. [DOC ##105, 111]; several motions to quash were filed in response. [DOC ##106, 107, 108, 109]. These motions to quash were sustained. [DOC ##110, 113, 114, 115].

During April 14 and 15 and part of April 16, 1965, the court worked with counsel in an attempt to arrive at some sort of pretrial order. The motions to compel answers of both parties were disposed of as reflected by the court reporter's notes of the sessions. On April 16, 1965, defendants renewed their Rule 41 motion to dismiss and further moved for summary judgment, and the summary judgment motion was argued based on an outline of plaintiff's statutory claims

for relief. Plaintiff was to furnish the court with a summarization of witnesses' testimony to be used in conjunction with the motion. Such was marked as Summary Judgment Exhibit 2; and agreed statement of facts was submitted as Summary Judgment Exhibit 1. In addition, plaintiff was to furnish the court with organized citations to depositions, exhibits, and interrogatories on file in this case which plaintiff felt sustained its various claims. The following exhibits were marked or were to be marked: Plaintiff Exhibits 1–21: from the Price deposition; Plaintiff Exhibits 22–49: from the Pyle deposition; Plaintiff Exhibits 50–52: from the Cleeton deposition; Plaintiff Exhibits 53–67: brought to the sessions; Summary Judgment Exhibits 1 and 2.

On April 26, 1965, plaintiff submitted a twelve page "summary" of citations to depositions and interrogatories which he contends sustain his various positions. [DOC #117]. Attached to this letter of citations were interrogatories and answers thereto in prior antitrust suits in this court and also a brief filed in the prior suits by an attorney who is representing defendants at bar. These additional items were not marked as exhibits at the pretrial sessions April 14 and 15, 1965.

## DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants' summary judgment motion will be considered in the same manner in which it was argued to the court —*i. e.*, the motion will be considered separately as to each of plaintiff's several asserted claims for relief. It should be stated initially that at the April 14, 1965 session, plaintiff admitted his claim under 15 U.S.C.A. § 13a was not good and such claim was dropped from the lawsuit.

## BACKGROUND

▉▉ Rule 56 applies to all parties and civil actions that are subject to the Federal Rules; and the presence of difficult legal questions in complicated or involved cases does not make a summary adjudication improper. The legal questions do not become easier by postponing resolution until after an unnecessary trial; and if the record presents an adequate, uncontroverted factual basis summary judgment may be rendered in such cases. 6 Moore, Federal Practice ¶¶ 56.-16, 56.17 [10] (2d ed. 1953) [hereinafter cited as 6 Moore].

▉▉ The object of a summary judgment motion is, of course, to separate what is formal or pretended from what is genuine and substantial, so that only the latter may subject a litigant to the burden of a trial. Richard v. Credit Suisse, 242 N.Y. 346, 152 N.E. 110, 45 A.L.R. 1041 (1926) (Cardozo, J.). Summary judgment procedure is in the nature of a pretrial inquiry brought on by motion of a party for a favorable determination that a trial is unnecessary because there is no genuine issue as to any *material* fact; and that on the established facts the movant is entitled to judgment as a matter of law. 6 Moore, ¶¶ 56.04 [1], 56.15 [1].

▉▉ The motion for summary judgment, like a motion to dismiss for failure to state a claim, or a motion for judgment on the pleadings, raises only a legal question. Summary judgment procedure is, however, a more trustworthy procedure because it enables the parties to go beyond the pleadings and present evidentiary matters to the court. 6 Moore, ¶¶ 56.04 [1], 56.09. In this regard, a summary judgment motion goes to the merits of a case and the court on summary judgment procedure is entitled to consider the pleadings, Rule 56(e) affidavits if any, depositions, answers to interrogatories on file in the case, admissions and stipulations, oral testimony, documentary and other evidentiary materials, and facts which are the subject of judicial notice. And the same reasons that warrant the use of presumptions at trial warrant their use in a summary judgment hearing. See, *e. g.*, 6 Moore, ¶¶ 56.10, 56.11 [1] to –[6], 56.11 [8] to –[10], 56.22. Allegations in pleadings may be evaluated in the light of

depositions and additional factual information before the court. Bushman Construction Co. v. Air Force Academy Housing, Inc., 327 F.2d 481, 484 (10th Cir. 1964).

The party moving for summary judgment has the burden of establishing the lack of any material triable issue of fact by the record before the court even though the opposing party would at trial have the burden of proof on the particular issue. And inferences should be viewed in a light favorable to the party opposing the motion. Bolack v. Underwood, 340 F.2d 816 (10th Cir. 1965).

In short, should no material fact dispositive of right or duty remain in the case, summary judgment is proper. Bushman, supra. While such relief is drastic, it becomes the *duty* of the trial court to grant summary judgment in an appropriate case. *E. g.*, Morrison Flying Service v. Deming Nat'l Bank, 340 F.2d 430, 432 (10th Cir. 1965). Further, depositions and stipulations may be used to negate the existence of a disputed fact. Bolack v. Underwood, 340 F.2d 816, 819 (10th Cir. 1965).

In short, while summary judgment procedure is not a catch penny contrivance to deprive a litigant of, nor is it a substitute for, a live trial when there are genuine issues of material fact to be tried, and while summary judgment is not a panacea for overcrowded dockets, it is when used judiciously a valuable measure in securing a just and expeditious adjudication of the merits of a lawsuit.

The parties to this lawsuit, during the April 14 and 15, 1965 session with the court, stipulated to the existence or lack of existence of certain uncontroverted facts which are set forth as Summary Judgment Exhibit 1. The parties have stipulated as to the organizational history and general business activities of defendants. It is admitted that one or more of the salesmen for defendant Service Auto have been authorized to and have sold products for both defend-ant Service and defendant Safelite in the same general area and occasionally in the same city. It is admitted that one or more of the salesmen for defendant Safelite have been authorized to and have sold products for both defendant Safelite and defendant Service in the same general area and occasionally in the same city.

It is admitted that defendant Service has for the purpose of obtaining business from insurance company agents, given such agents and their companies free advertising at times. It is admitted that defendant Safelite maintains a warehouse in Dallas and on occasion orders taken by Safelite in Wichita are filled by the warehouse in Dallas. It is admitted that during a six-month period in approximately 1961 defendant Safelite and defendant Service Auto sold a grade of Guardian brand glass which was less than the top quality of glass manufactured by Guardian at that time; the glass was purchased from Guardian at a discount from the price charged for top quality glass. It is admitted that defendant Service Auto has requested Farmers Insurance Company representatives to contact agents who are not sending all of their business to defendant Service. It is admitted that the determination of the price at which defendant Service and defendant Safelite will sell their merchandise. is made by R. D. Hubbard, Arthur Lankin, and their salesmen. It is stipulated that defendant Service Auto charged the same price for Guardian seconds that passed Service Auto's inspection as it charged for top quality Guardian windshields.

It is stipulated that defendant Safelite operates a facility in Kansas City, Missouri, under the name of "Service Auto Glass Co." It is admitted that Auto Glass Co. and Service Auto Glass Co. in Wichita are the same entity.

It is stipulated that the automobile glass business is a competitive business with success in part dependent upon quality of service rendered and it is customary to grant volume discounts.

It is admitted that plaintiff has never been a customer of any of the defendants, and it is admitted that plaintiff does not compete with defendant Safelite in the sale of auto glass at the distributor level. It is admitted that in Wichita alone, there are presently more automobile glass shops in existence than there were in 1959. It is admitted that none of the defendants has ever threatened plaintiff individually with anything.

It is stipulated that plaintiff believes he can buy automobile windshields from Carl Graham Paint & Wallpaper Co. at a discount of 60% and 10% from the NAGS price list if more than a single lite is purchased at a time, although plaintiff normally purchases only one lite at a time.

It is admitted that the profit and loss statements filed by plaintiff with his federal income tax returns do not properly reflect the net profit derived by plaintiff from the operation of Becker's Auto Glass. In each year the figure reflected on the federal income tax return is lower than the actual net profit derived by plaintiff from the operation of his business.

It is stipulated that the relevant market product in this litigation is automobile glass, both flat and curved.

The parties have taken differing positions as to what the relevant market area for this case should be geographically. Plaintiff would define the relevant market area as· that area in which plaintiff does business [the metropolitan Wichita area]; whereas defendants argue that the relevant market area must be that area in which defendants have allegedly committed the acts proscribed by the antitrust laws. Put another way, defendants contend the relevant market area is the area of effective competition in which competitors offer reasonably interchangeable products of like quality. There is no factual variance, however, and no material fact dispute involved. The parties are arguing different legal theories, but whatever definition the court adopts, the facts are agreed as to the boundaries under a given definition.

In other words, if the market area is the area in which plaintiff does business, the boundaries of that area are stipulated; if it is to be determined by where defendants compete in the autoglass business, the facts establishing those boundaries are admitted; if it is to be determined by the area in which defendants have allegedly committed the proscribed acts, the facts establishing those boundaries are admitted.

It is further admitted that as to the area in which defendants compete and purportedly violated the antitrust laws, plaintiff is unaware after eighteen months of investigation time of the total annual volume of commerce in automobile glass in that area; the portion of that volume held by defendants; the portion of that volume held by plaintiff; and the portion of that volume affected by any activities of any of the defendants. And it is admitted that however the market area is defined, Pittsburgh Plate Glass Company, Libbey Owens-Ford Glass Company, Ford Motor Company and Shatterproof Glass Corporation are each engaged in the automobile glass business in that relevant market area or area of effective competition.

## THE ANTITRUST STATUTES INVOLVED AT BAR

15 U.S.C.A. § 13(a) [§ 2(a) Clayton/Robinson-Patman] provides that it is unlawful for any person *engaged in commerce, in the course of such commerce,* to directly or indirectly discriminate in price between different purchasers of *commodities* of *like grade* and quality, where at least one of the purchases involved in such discrimination is *in commerce,* where the effect of the discrimination may be substantially to lessen competition or tend to create a monopoly.

15 U.S.C.A. § 13(d) [§ 2(d), Clayton] provides that it is unlawful for a person *engaged in commerce* to pay anything of value to a *customer* of such person *in the course of such commerce* as compensation for services furnished by or through such customer in connection with

the processing or sale of products of commodities manufactured or sold by such person, *unless* such payment is available on proportionally equal terms to *all other customers competing in the distribution of such commodities.*

15 U.S.C.A. § 13(e) [§ 2(e), Clayton] provides that it is unlawful for a person to discriminate in favor of one *purchaser against another purchaser* of a commodity bought for resale by furnishing services or facilities connected with the handling or sale of such commodity so purchased on terms *not accorded to all purchasers* on proportionally equal terms.

15 U.S.C.A. § 2 [§ 2, Sherman] provides that it is unlawful for a person to monopolize, or attempt to monopolize, or combine or conspire to monopolize, any part of commerce among the states.

15 U.S.C.A. § 14 [§ 3, Clayton] provides that it is unlawful for a person *engaged in commerce, in the course of such commerce,* to sell or contract to sell goods or commodities for use or resale, or fix a price charged therefor, or discount from such price, *on the condition, agreement or understanding* that the purchaser shall *not use or deal* in the goods or commodities of a *competitor of the seller,* where the effect of such sale or contract for sale on such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in a line of commerce.

15 U.S.C.A. § 1 [§ 1, Sherman] prohibits a contract, combination or conspiracy in restraint of trade or commerce among the states.

With this background, we proceed to plaintiff's specific claims for relief.

### A. ALLEGED VIOLATIONS OF 15 U.S.C.A. § 13 [§ 2, CLAYTON/ROBINSON-PATMAN]

Plaintiff alleges that defendant Safelite has discriminated in price among its customers in Kansas and in other states for commodities of like grade and quality in violation of 15 U.S.C.A. § 13 [See Amended Complaint, ¶ 15(a), DOC #23].

▮▮▮▮ At the oral arguments, plaintiff asserted that to establish a showing of price discrimination, it need not show that a sale crossed state lines and that a sale need only "affect" the stream of commerce to fall under § 2, Clayton/Robinson-Patman. We do not agree. The commerce coverage of § 2, Clayton, which is the same as § 2, Robinson-Patman, falls short of the broad coverage of the Sherman Act. The Clayton/Robinson-Patman Act specifically states that the proscribed discrimination in price is to occur "where either or any of the purchases involved in such discrimination are *in* commerce." (emphasis added). This language requires us to conclude that at least one of the two transactions utilized to show proscribed price discrimination must occur "in" commerce— *i. e.,* must cross a state line. Any broader construction is refuted by legislative history, since a clause in the House Bill that would have adopted the "effect on commerce" standard was struck. See H.R.Rep.No.2951, 74th Cong., 2d Sess., p. 6 (136). See also Rowe, Price Discrimination Under the Robinson-Patman Act 78–79 (1962). And see Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943, 946 (6th Cir. 1962), cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963). [The Sixth Circuit also was of the opinion that the Robinson-Patman Act gives a right of action to a competitor of a seller as well as to a customer under § 2(a)]. Plaintiff has not shown any evidence in the record properly before us of a discrimination arising from consummated contemporaneous sales by the same seller to different purchasers involving commodities of like grade and quality occurring *in commerce,* nor has he justified the lack of such showing. Plaintiff instead argues that the alleged discrimination need not occur in commerce. In short, plaintiff cannot meet the "in commerce" requirement of § 2, Clayton case. And in our opinion such failure is uncontroverted in the record properly before us. And failure to establish any one of the jurisdictional elements required by the Act

precludes applicability of § 2, Clayton/Robinson-Patman. See Rowe, op. cit. supra, at 45.

Since the uncontroverted failure to meet the "in commerce" requirement of 2(a), Clayton is fatal, any and all other possible disputed fact issues become legally immaterial for summary judgment purposes and could be assumed arguendo to exist in the light most favorable to plaintiff. For example, whether or not a different price was charged different purchasers on like goods is immaterial where at least one of such sales did not occur "in commerce."

Plaintiff further argues that a refusal to sell also constitutes price discrimination. As a matter of law this argument has no merit. No actionable price discrimination can arise until two completed transactions occur, thus a refusal to sell, assuming arguendo that one exists, cannot constitute a violation of 15 U.S.C.A. § 13(a). See Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219, 1228 (1949) (involving quantity discounts) ("[N]o single sale can violate the Robinson-Patman Act. At least two transactions must take place in order to constitute a discrimination.")

We note that the only testimony properly before us with which we are familiar is to the effect that Safelite may have refused to sell to two or three companies because those companies were bad credit risks and had outstanding, unpaid bills owing to defendant Safelite. [E. g., Lankin Second Deposition, pp. 6–11; Hubbard Deposition, pp. 23–25]. Plaintiff also cites us to pages 121 and 122 of Lankin's second deposition to establish refusal to sell. [See DOC #117, p. 2]. We fail to find anything on page 121 concerning refusals to sell—and a question on page 122 re refusals to sell was never answered because the witness and his attorney felt the question had been answered previously.

And we can find nothing in the record properly before us to indicate that defendants have refused to sell to plaintiff.

As a matter of uncontroverted fact, in response to Interrogatory 4 (second set) [DOC #74, p. 2], plaintiff indicated he *could* buy glass from defendant Safelite more cheaply than elsewhere, but that plaintiff preferred to purchase L-O-F glass, which defendants do not carry. [See DOC #81, unnumbered p. 2]. This would indicate that it was plaintiff who declined to buy from defendants, rather than defendants who refused to sell to plaintiff.

In any event, granting plaintiff the benefit of every conceivable inference—and viewing this evidence in the light most favorable to plaintiff, and assuming arguendo that a refusal to sell has been established, it cannot in our opinion form the basis of a 2(a), Clayton/Robinson-Patman claim.

At the oral arguments on April 16, 1965 plaintiff also asserted violations by defendants of 15 U.S.C.A. §§ 13(d) and –(e) [2(d) and 2(e), Clayton] through advertising practices and through services and goods which defendant Safelite purportedly furnishes defendant Service. Assuming arguendo the truth of the asserted factual allegations, and assuming arguendo a violation by defendants of 15 U.S.C.A. §§ 13(d) and –(e), plaintiff has no standing as a matter of law to base a claim for relief thereon.

Section 2(d) Clayton ensures proportionally equal treatment to "all other *customers* competing in the distribution of such products or commodities." (emphasis added) And § 2(e) Clayton proscribes sales on terms "not accorded to all *purchasers* on proportionally equal terms." (emphasis added)

In our opinion, this language clearly demonstrates that 2(d) and 2(e) of Clayton/Robinson-Patman protect only competing customers or purchasers; therefore the obligations under 2(d) and 2(e) to ensure proportional equality extend only to those who buy the promoted products at approximately the same time. Since 2(d) and 2(e) require that all buyers of the supplier who compete in resale of its product are entitled to pro-

636

motional treatment on proportionally equal terms, a plaintiff must be a *customer* who competes with the favored customer in order to recover under 2(d) or 2(e). See FTC Guides for Advertising Allowances and Other Merchandising Payments and Services, 1 CCH Trade Reg. Rep., pp. 6072, 6073 (1960). See also Rowe, op. cit. supra, at 397–99. We recognize that the Sixth Circuit in the Willard Dairy case supra, indicated that the Robinson-Patman Act gave a right of action to a competitor as well as to a customer, but that case arose under 2(a) only—it did not involve a question of interpretation or coverage of either 2(d) or 2(e). And the wording of 2(d) and (e) is in our opinion clear on the subject.

■ At bar, it is uncontroverted that plaintiff has never been a customer of any of the defendants [Pretrial Agreed Facts, ¶ 24, Summary Judgment Exhibit 1]. It is also uncontroverted that defendant Service Auto offers equal treatment to all insurance company customers. This is shown by plaintiff's own exhibits. [See, e. g., plaintiff exhibits marked as Exhibits 4a, and 13 to the Pyle deposition]. But assuming unequal treatment of defendants' customers, such facts are immaterial as a matter of law when it is admitted that plaintiff is not a customer and thus not under the shelter of 2(d) and 2(e) protection. We must conclude on the basis of uncontroverted facts before us that plaintiff has no status to ground a claim for relief on alleged violations of 15 U.S.C.A. §§ 13(d) and/or –(e).

## B. ALLEGED VIOLATIONS OF 15 U.S.C.A. § 2
### [§ 2, Sherman]

Plaintiff alleges that defendants have monopolized or attempted to monopolize interstate trade and commerce in the automobile glass industry in violation of § 2, Sherman. [Amended Complaint, § 13; DOC #23].

There is no controversy as to the relevant market product involved in this case. The relevant market product is commonly referred to as the "auto glass industry," or more specifically, automobile glass, both flat and curved. [Pretrial Agreed Facts, ¶ 32, Summary Judgment Exhibit 1].

We are initially confronted with the relevant market area as geographically applied to this case. As indicated above, there is no factual dispute as to the boundaries of the relevant market area once this court determines as a matter of law how the term is to be defined.

■ We are of the opinion that the relevant market area must be defined as the area in which the defendants compete and in which defendants have allegedly monopolized or attempted to monopolize the relevant market product. It is admitted that Service Auto has sold glass in competition in Kansas, Oklahoma, Missouri and Nebraska. [Pretrial Agreed Facts, ¶ 2, Summary Judgment Exhibit 1]. And it is uncontroverted that defendant Safelite competes in some thirteen or fourteen states and that plaintiff alleges it has attempted to monopolize automobile glass, flat and curved, in all those states. The states include Kansas, Oklahoma, Colorado, Missouri, Arkansas, Nebraska, Iowa, South Dakato, North Dakota, Texas, New Mexico, Alabama, Tennessee and Louisiana.

Plaintiff in response to interrogatories, defined the relevant market area consistent with the definition we adopt.

Interrogatory 74 in defendant Safelite's second set [DOC #74] states in part:

"Define the relevant market (both as to product and geographical area) in which you allege the defendants, or any of them, to have created or *attempted to create* a monopoly?" (emphasis added)

Plaintiff's answer was as follows [See DOC #81]:

"This would extend to anywhere where Service Auto Glass or Safelite Glass Company does business. *This should by reference include not only the State of Kansas but any other state in which those two de-*

*fendants market their products."* (emphasis added)

At the oral arguments on the motion, however, plaintiff asserted that in an *"attempt to monopolize"* case, the relevant market area is not in issue, relying on Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Denial of certiorari, of course, imports nothing as to the merits of a case or the holding below. It means only that, for whatever reason, there were not four members of the Court who wished to hear the case. E. g., Wright, Federal Courts § 108 (1963); Brown v. Allen, 344 U.S. 443, 492, 73 S.Ct. 397, 97 L.Ed. 469, 507 (1953) (separate opinion of Frankfurter, J.); United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361, 364 (1923).

The Ninth Circuit in Lessig relied on a footnote in United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 395 n. 23, 76 S.Ct. 994, 1007 n. 23, 100 L.Ed. 1264, 1281 n. 23 (1956) for its statement that the relevant market is not in issue in an attempt to monopolize case. With all respect, we do not read Du Pont as justifying such a statement; nor do we read any of the cases cited in the Du Pont footnote as justifying such a statement. For example, the Du Pont footnote cites Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), but recognizes that the "scope of the market was not in issue" in the Parchment Co. case. The parties were apparently satisfied that interstate trade in vegetable parchment paper sufficiently described the market. Du Pont also cites Indiana Farmer's Guide Publ. Co. v. Prairie Farmer Publ. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934), which was an "attempt to monopolize" case. The complaint in that case charged attempted monopolization *in the area served by defendant's publications*, and the Court specifically recognized that the provisions of § 2, Sherman have a geographic significance. 293 U.S. at 278–279, 55 S.Ct. at 185, 79 L.Ed. at 361.

And the Supreme Court mentioned the geographical significance of the relevant market area in United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948) [a § 1, Sherman case, but also cited in the Du Pont footnote], in language referring to the Sherman Act generally. ("[W]here the relevant competitive market covers only a small area the Sherman Act may be invoked * * *") 334 U.S. at 519, 68 S.Ct. at 1120, 92 L.Ed. at 1550). The Court then defined the "relevant competitive market" for an unreasonable restraint or an attempt to monopolize as an eleven-state area in which a defendant marketed its products.

In short, we are of the opinion that even in an attempt to monopolize case, the relevant market area has geographic significance and the limits of that relevant market area are fixed by the area which the defendants allegedly sought to appropriate to themselves. American Football League v. National Football League, 323 F.2d 124, 129 (4th Cir. 1963) ("In considering an attempt to monopolize, it, of course, is appropriate to limit the relevant geographic market to the area which the defendant sought to appropriate to itself, * * *"). An allegation that defendants have "attempted to monopolize" has meaning only in connection with a relevant market product—here automobile glass, both flat and curved. And it seems to us that an allegation of attempted monopolization of automobile glass, both flat and curved, is legally meaningful only when limited to the geographic area in which the alleged attempt occurred.

The Ninth Circuit in Lessig cites in a footnote, Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1961), where the court held it was not reversible error for the trial court to refuse to define in an instruction, relevant market in an "attempt" case "even though they [requested instructions] may have been literally correct statements." 300 F.2d at 586. We find nothing in Nisley which should change our interpretation of the requirements of a § 2, Sherman case or

our interpretation of the Supreme Court cases re relevant market area.

In short, we feel to adopt plaintiff's construction of § 2, Sherman re a market area would be to ignore Supreme Court language to the contrary. See United States v. Johns-Manville Corp., 231 F. Supp. 690, 699 (E.D.Pa.1963).

█ In the case at bar, plaintiff is unaware of the total annual volume of commerce in automobile glass in the relevant market area; the portion or percentage of that volume held by defendants; the portion or percentage of that volume held by plaintiffs; and the portion or percentage of that volume affected by any activities of any of the defendants [Pretrial Agreed Facts, ¶ 27, Summary Judgment Exhibit 1]. Plaintiff offers no explanation of why it does not possess such facts after eighteen months of discovery. Further, it is stipulated that Pittsburgh Plate Glass Company, Libbey-Owens-Ford Glass Company, Ford Motor Company, and Shatterproof Glass Corporation are all engaged in the automobile glass business in the relevant market area [Pretrial Agreed Facts, ¶ 31, Summary Judgment Exhibit 1]. And it is admitted that in Wichita, alone, there are now more auto glass shops in existence than there were in 1959 [Pretrial Agreed Facts, ¶ 26, Summary Judgment Exhibit 1]. With the four giants of the auto glass industry competing in the relevant market area, with more glass companies now than there were, it is inconceivable, of course, that defendants could actually monopolize the area.

In light of these stipulated facts, and the lack of proof which they demonstrate, we are of the opinion that plaintiff has not established and cannot establish a claim on which relief can be granted under § 2, Sherman. And in light of these uncontroverted facts, all other facts or factual allegations about which there could be some controversy, become legally immaterial for the purposes of the summary judgment motion. Without the facts and evidence which plaintiff admittedly does not have, a § 2, Sherman

case simply cannot, in our opinion, be established.

## C. ALLEGED VIOLATIONS OF 15 U.S.C.A. § 14
### [§ 3, Clayton]

Plaintiff does not allege in the introductory paragraph of his Amended Complaint [DOC #23] that he is relying on § 3, Clayton, but in paragraph 12 of the Amended Complaint, plaintiff does allege that

"the Defendants, and others have entered into contracts among and between themselves and with other customers which contracts have been in unreasonable restraint of, and have substantially lessened competition in the afore-described interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14)."

And at the pretrial conference and the oral arguments on the summary judgment motion, plaintiff has asserted a § 3, Clayton claim.

█ As indicated earlier, § 3, Clayton generally makes it unlawful for any person engaged in commerce to make a sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (with the earlier § 3, Clayton Supreme Court cases therein referenced), is dispositive of this phase of the case at bar. Briefly, Tampa Elec. involved a "requirements contract" and its alleged violation of § 3, Clayton and § 1 and § 2, Sherman. The lower courts held it violative of § 3, Clayton, by-passing the Sherman Act questions. The Supreme Court reversed, and in so doing, set out guidelines as to "certain considerations" that must be taken in evaluating a § 3, Clayton case.

*First*. The line of commerce (i. e., the type of goods involved) must be deter-

mined on the basis of the particular facts of a given case. 365 U.S. at 327, 81 S. Ct. at 627, 5 L.Ed.2d at 587. There is no dispute at bar in this respect. It is agreed that the relevant market product (which is synonymous with "line of commerce") is automobile glass, both flat and curved. [Pretrial Agreed Facts, ¶ 32, Summary Judgment Exhibit 1].

*Second.* "[T]he area of effective competition in the known line of commerce must be charted by careful selection of *the market area in which the seller operates,* and to which the purchaser can practicably turn for supplies." 365 U.S. at 327, 81 S.Ct. at 628, 5 L.Ed.2d at 587 (emphasis added).

██ In other words, the threatened foreclosure of competition must be in relation to the market affected. And the Court in Tampa Elec. uses "area of effective competition" and the "relevant market" as interchangeable terms. Id. at 328, 81 S.Ct. at 628, 5 L.Ed.2d at 587. Since it is the preservation of competition which is at stake, the significant portion of coverage under § 3, Clayton is that within the area of effective competition. Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 299, 69 S.Ct. 1051, 93 L.Ed. 1371, 1378 (1949). In the Standard Oil case, the Supreme Court defined the area of effective competition as the area where the seller and its competitors sold their products (including some seven states) [See Tampa Elec., supra, 365 U.S. at 328, 81 S.Ct. at 628, 5 L.Ed.2d at 587]. We are therefore of the opinion that the relevant market area utilized in our consideration of the alleged § 2, Sherman violation is also the relevant market area for consideration of an alleged § 3, Clayton violation. [The Court in Tampa Elec. for example, cites § 1, Sherman relevant market language in discussing relevant market for § 3, Clayton as the competitive area in which a defendant markets its products. See 365 U.S. at 328, 81 S. Ct. at 628, 5 L.Ed.2d at 587].

*Third.* The competition foreclosed by the agreement or contract *"must be found*

to constitute a substantial share of the relevant market." 365 U.S. at 328, 81 S.Ct. at 628, 5 L.Ed.2d at 587 (emphasis added). The Court in Tampa Elec. continued:

"To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on *the relevant area of effective competition,* taking into account the relative strength of the parties, *the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area,* and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." 365 U.S. at 329, 81 S.Ct. at 629, 5 L. Ed.2d at 588 (emphasis added).

It is significant to add that a primary reason for reversal in Tampa Elec. was that the lower courts had not given the required effect to the relevant market area.

"This omission, by itself, requires reversal, for, as we have pointed out, *the relevant market is the prime factor* in relation to which the ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided." 365 U.S. at 329, 81 S.Ct. at 629, 5 L.Ed.2d at 588 (emphasis added)

Further, the above statements were made in face of an assumption arguendo by the Court that the contract there involved was an exclusive-dealing arrangement within the compass of § 3, Clayton. 365 U.S. at 330, 81 S.Ct. at 629, 5 L.Ed.2d at 588.

██ In the case at bar, plaintiff has no evidence whatsoever which would tend to establish that any competition foreclosed by contracts or arrangements constitute a substantial share of the relevant market. Plaintiff has not established the "proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area" which must be considered in deciding a § 3, Clayton case. As stated

above, plaintiff is unaware of the total annual volume of commerce in automobile glass in the relevant market area; is unaware of the portion of that volume held by plaintiff and held by defendants; and is unaware of the portion of that volume affected by any activities of any of the defendants. [Pretrial Agreed Facts, ¶ 27, Summary Judgment Exhibit 1]. And this would be true even if we were to greatly restrict the geographic boundaries of the relevant market area. Plaintiff admits it has purchased glass from a source in Kansas City, Missouri [Pretrial Agreed Facts, ¶ 2, Summary Judgment Exhibit 1]. Thus we would be forced to conclude in any event that plaintiff can practically turn for supplies at least to all of Kansas and the metropolitan Kansas City, Missouri area. And plaintiff has no facts or evidence properly before us to establish "the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area" even if the market area were so restrictively drawn.

It is thus factually uncontroverted that an essential element of a § 3, Clayton case is missing in the case at bar; other facts become legally immaterial. Therefore giving plaintiff the benefit of every conceivable inference, and assuming arguendo the existence of a contract or understanding within the proscriptions of § 3, Clayton, it is clear to us that plaintiff cannot establish a § 3, Clayton case which would be submissible under the requirements of Tampa Elec.

### D. ALLEGED VIOLATIONS OF 15 U.S.C.A. § 1 [§ 1, Sherman]

Plaintiff alleges that defendants and others have entered into contracts among themselves and with others in unreasonable restraint of trade and commerce among the several states. [See Amended Complaint, ¶ 21, DOC #23].

■■ Much of what has been said before is applicable here. Assuming arguendo a combination or contract among and between defendants and others, plaintiff has brought forth no facts tending to show a restraint of trade or commerce in the relevant market area. That a relevant market area must be considered in a § 1, Sherman case see United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). The parties have agreed that plaintiff is unaware of the annual volume of commerce in automobile glass, flat and curved in the relevant market area; of the portion of that volume held by plaintiff and by defendants; and of the portion of that volume affected by any activities of any of the defendants. [Pretrial Agreed Facts, ¶ 27, Summary Judgment Exhibit 1]. Further, it is admitted that there are now more automobile glass shops in Wichita alone than there were in 1959. [Pretrial Agreed Facts, ¶ 26, Summary Judgment Exhibit 1].

Viewing the evidence properly before this court in a light most favorable to plaintiff, the uncontroverted lack of facts summarized above requires us to conclude that as a matter of law there is nothing on which plaintiff can base a claim of restraint except conjecture.

Plaintiff makes some argument of an exclusive-dealing arrangement between defendants and an insurance group as a violation of § 1, Sherman. This alleged arrangement was found not to be established supra as a violation of § 3, Clayton due to a fatal lack of facts. In our opinion that would, for practical purposes, preclude the alleged insurance group arrangement as a violation of either § 1 or § 2, Sherman.

> "We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 335, 81 S.Ct. 623, 632, 5 L.Ed.2d 580, 591 (1961).

In short, we feel there is a fatal absence of facts on which plaintiff could base a § 1, Sherman case. Plaintiff is

seeking to establish a treble damages antitrust suit by conjecture and afterthought, and not by a showing of evidence and facts. Plaintiff has had over a year and a half to gather sufficient evidence to support his case.

In summary, we feel that viewing plaintiff's contentions in a light most favorable to him, there is an uncontroverted lack of factual basis to support his claims, and that defendants' motion for summary judgment would be good even if the Fed.R.Civ.P. 41(b) motion to dismiss were not.

## FED. R. CIV. P. 41(b) MOTION TO DISMISS

Alternatively, we shall evaluate defendants' pending motion to dismiss pursuant to Federal Rule 41(b) and for judgment for costs.

Fed.R.Civ.P. 41(b) provides in part as follows: "For failure of the plaintiff to prosecute or to comply with these rules or any order of the court, a defendant may move for dismissal of an action or of any claim against him."

Local Rule 14(a) provides as follows:

"In all civil cases, except * * * cases involving the antitrust laws, discovery procedures provided for in Rules 26 through 37, Federal Rules of Civil Procedure, shall be completed by the attorneys within four months after the case is at issue. In * * * antitrust cases, such discovery procedures shall be completed within eight months after the case is at issue. The court, on motion for good cause shown, *and upon such conditions as the court shall impose, may extend the time for completion of discovery."* (emphasis added).

Answers were filed and the case at bar was at issue on March 18, 1964 [DOC ##35, 36, 37]. Roughly six months after the case was at issue (on September 3, 1964), this court ordered that discovery was to be completed within 90 days [DOC ##51, 53]. On December 14, 1964, this court again extended the time for discovery until February 12, 1965, roughly eleven months after the case was at issue and roughly eighteen months after the case was filed. [See DOC #78]. After the case had been pending for almost eighteen months, and in the face of this court's order of December 14, 1964, plaintiff had not on February 10, 1965 (two days prior to the ordered discovery deadline) completed discovery or submitted a proposed pretrial order as ordered. On February 10, 1965, plaintiff moved for still another extension of time for discovery and for the submission of a pretrial order. [DOC #91].

 A federal court can, of course, dismiss a case with prejudice for failure to prosecute even though no local court rule specifically covers the situation. Link v. Wabash R.R., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734, rehearing denied, 371 U.S. 873, 83 S.Ct. 115, 9 L.Ed. 2d 112 (1962). Local Rule 17 deals with dismissals for failure to prosecute under certain circumstances; there appears no specific Local Rule re dismissals for failure to comply with an order of the court, but under Link none would appear necessary.

 The power to invoke the sanctions of Federal Rule 41(b) "is necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts." Link v. Wabash R.R., supra, 370 U.S. at 629–630, 82 S. Ct. at 1388, 8 L.Ed.2d at 737. We recognize that dismissal is a harsh sanction, and should be utilized only in extreme cases. *E. g.,* Meeker v. Rizley, 324 F.2d 269 (10th Cir. 1963). See also O'Brien v. Sinatra, 315 F.2d 637 (9th Cir. 1963).

 The courts are always open for the purpose of litigating disputes in accordance with the rules and procedures of the courts. And one rule is that a plaintiff must prosecute an action with due diligence and must adhere to court rulings and orders in that regard. Violation of that rule means a plaintiff stands to suffer the penalty of dismissal. See Janousek v. Wells, 303 F.2d 118 (8th Cir. 1962).

 The case at bar is the third or fourth oldest Wichita case still pending trial in Wichita. In view of the history of this case, the extensions of time granted, the orders of the court entered and the failure to comply therewith, we are of the opinion that defendants' motion to dismiss under Federal Rule 41(b) should have been granted.

In the context of notice pleadings, the permission of the court for plaintiff to "gather evidence" to support his case is a double-edged sword. A plaintiff's duty is also to advise his adversary so that the opposition may prepare to rebut claims made by a plaintiff. Discovery processes would otherwise be useless to assist in reaching a proper and, hopefully, prompt resolution of a dispute.

We would further point out that this court has many private antitrust suits pending before it. We are concerned that unless this court exercises a firm hand the expense of such suits in time, money and effort may cause financial ruin to all the parties to these pieces of litigation; may well impede the effective resolution of disputes for other litigants; and in addition, may well cause settlements of meritorious claims or defenses solely on the basis that the use of the courts has become too costly a vehicle for the disposition of grievances.

We see no use in prolonging this litigation further; in fact, we feel that to do so would be a disservice to the parties as well as to the court.

Recognizing as we do and have, the need for courts to give litigants their day in court and to avoid arbitrary action, this case cries out for judicial determination. We will take that action.

We are of the opinion that defendants' motion to dismiss under Federal Rule 41(b) would be good even if the summary judgment motion were not.

As a part of defendants' motion to dismiss under Federal Rule 41(b), defendants also move for judgment for costs incurred. They allege their costs to be $1,507.29 [DOC #97]. We feel that under the circumstances of this case, de-fendants are not entitled to such costs, and such motion will not be granted. Each party will pay his own costs.

Prevailing counsel shall prepare, circulate and submit an appropriate order.