The H. F. & S. COMPANY, Inc.,
Plaintiff,

v.

AMERICAN STANDARD, INC.,
Defendant.

Civ. A. No. W–3856.

United States District Court,
D. Kansas.

Dec. 19, 1968.

Memorandum Jan. 6, 1972.

Harry L. Hobson, of Jochems, Sargent & Blaes, Wichita, Kan., Butler, Jablow & Geller, New York City, for plaintiff.

Malcolm Miller and Benjamin C. Langel, of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for defendant.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

WESLEY E. BROWN, Chief Judge.

This is a treble damage action filed under Section 4 of the Clayton Act [15 U.S.C. § 15], the jurisdictional basis for which is found under the provisions of 28 U.S.C. § 1337, entitled "Commerce and anti-trust regulations." It is before the Court on the motion of the defendant for summary judgment under Rule 56, Fed.R.Civ.P., Title 28 U.S.C.

The defendant is a corporation existing under and by virtue of the laws of the State of Delaware with its principal office in New York City, New York. Defendant has done and is presently doing business in Kansas. Its registered office in this state is the First National Bank Building, Topeka, Kansas and its resident agent at such address is the Corporation Company, Inc. Defendant is therefore subject to service of process in this state and to the jurisdiction of this court.

The plaintiff (formerly known as the Hutchinson Foundry and Steel Company, Inc.) is a corporation existing under and by virtue of the laws of the State of Kansas, with its principal place of business at Hutchinson, Kansas.

Defendant corporation was incorporated in Delaware in 1929 to acquire the capital stock of American Radiator Company and the Standard Sanitary Manufacturing Company, both of which were organized as New Jersey Corporations in 1899. It maintains executive offices at 40 West 40th Street, New York City, New York, and corporate offices at 100 West 10th Street, Wilmington, Delaware. It maintains 23 manufacturing plants in 22 locations in the United States and operates with and through subsidiaries both in the United States and throughout the world. The corporation manufactures a variety of products including plumbing fixtures, plumbing

fittings and heating and air conditioning equipment. Distribution of its products is handled through branches, agents, and sales offices located throughout the world.

This action is primarily concerned with the Plumbing and Heating Division of defendant corporation. Specifically involved is the plumbing fixture line of products manufactured and distributed by defendant including cast iron, china and brass fixtures. All products involved are manufactured in states other than Kansas and all such products reach Kansas through various modes of interstate transportation. Defendant's Plumbing and Heating Division maintains its midwestern sales district office at 4709 Belleview, Kansas City, Missouri, and it is through that office that defendant distributes the products in the geographical area with which we are here concerned. Defendant is regularly engaged in commerce.

The defendant's sales volume exceeds one-half billion dollars and a substantial portion of such volume is attributable to the sale of plumbing fixtures.

The defendant is the largest of the five major manufacturers of plumbing fixture line products.

The defendant's share of the plumbing fixture market nationally is roughly twice that of its nearest competitor.

Until June 1966 plaintiff sold defendant's products throughout central and western Kansas from its plant in Hutchinson, Kansas. In June 1966 plaintiff contracted to sell its plumbing and heating division to Kamen Supply Co., Inc. of Wichita. Both plaintiff and Kamen sold fixtures at wholesale to plumbing contractors, hardware distributors and lumber yards.

In May 1966 the plaintiff determined to sell its plumbing and heating division and entered into a contract with Kamen for such sale. The contract for sale included the inventory of and plaintiff's "franchise" for the sale of defendant's products. Plaintiff was a distributor in

good standing with defendant at that time.

Mr. Pierce, an employee of defendant, knew that a part of the agreement between plaintiff and Kamen was the right to distribute defendant's products.

Defendant through its agents and representatives, including H. C. Pierce at a meeting in Wichita, Kansas in June 1966 with the representatives of Kamen, agreed to extend the "franchise" held by plaintiff to Kamen. However, as a condition to continued sales under the "franchise," Kamen would be required to purchase defendant's products for distribution from its Garden City, Kansas plant as well as the Hutchinson, Kansas plant. As a further condition, Kamen would be required to purchase and distribute defendant's plumbing line to the exclusion of plumbing fixtures and related products of two other manufacturers then being handled by Kamen at Garden City, Kansas. Defendant advised Kamen that in order to purchase its plumbing fixture line, Kamen would have to purchase certain related products manufactured by the defendant. When Kamen refused to become a party to the arrangement, defendant refused to continue to sell plumbing fixtures to Kamen, though defendant had sold to Kamen during the negotiation period.

The activities of the defendant of which the plaintiff complains have their greatest impact in that area of the State of Kansas west of U. S. Highway 81. Such area has a population of 600,000.

At the time defendant made its demands on Kamen, the defendant knew Kamen sold at wholesale approximately 75% of all the plumbing line fixtures in the geographical area west of U. S. Highway 81 in Kansas. Defendant knew that accession to its demands would assure it of a monopolistic position in the sale of plumbing fixtures in the described area, with the ability to control prices and exclude competition.

The plaintiff has been damaged in its business and property in that defendant's demands caused Kamen to with-

draw from its contract to purchase with plaintiff.

In June 1966 plaintiff and Kamen entered into a new contract specifying a purchase price of $175,000.00 rather than the original contract price of $265,-000.00.

A part of the difference in sale price was the direct result of the activities of the defendant effecting an inability of Kamen to obtain the "franchise" and products of the defendant without engaging in the activities promoted by the defendant. Plaintiff has lost a substantial portion of the value of its inventory of defendant's products on hand, lost its goodwill and is damaged in the sum of $30,000.00 for which it seeks the threefold sum of $90,000.00.

Assuming the truth of the foregoing factual recitation in our judgment would preclude the granting of summary judgment and we therefore decline to do so.

■ Plaintiff's standing to sue requires that it allege facts which show the following: 1) defendant violated the anti-trust laws; 2) defendant's illegal conduct caused it a business or property injury; and 3) its injury is measurable in dollars.

Plaintiff's complaint is that defendant violated Section 2 of the Sherman Act [15 U.S.C. § 2] by attempting to monopolize the market in the geographical area west of U. S. Highway 81 in Kansas. The overt acts said to constitute the violation are that 1) defendant refused to deal with Kamen unless Kamen would deal exclusively in defendant's product at Kamen's Garden City, Kansas branch, and 2) defendant refused to deal with Kamen unless Kamen would handle certain "tie-in" products also manufactured by defendant. Plaintiff claims that under Section 4 of the Clayton Act [15 U.S.C. § 15] there has been a violation of the anti-trust laws which has caused plaintiff to be injured in its business and property for which reason it is entitled to recover treble damages.

The heart of the private antitrust action lies in Section 4 of the Clayton Act which appears as 15 U.S.C. § 15 and provides in germane part as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold damages by him sustained.

The statute itself discloses no requirements for recovery in addition to proof that plaintiff was injured in his business or property by reason of anything forbidden by anti-trust laws. Plaintiff argues, citing Radovich v. National Football League,[1] that the court should not add requirements to burden the litigant beyond those set forth by Congress. The Supreme Court in *Radovich* had before it no issue of remote, indirect or derivative damages and was thus not called upon to consider such competing factors as public good and protection of the individual versus possible "windfall" treble damage recoveries. It is thus not controlling at bar.

■ The courts have, however, read certain restrictions into Section 4 of the Clayton Act [15 U.S.C. § 15]. As an example, for plaintiff to prove an injury by reason of anything forbidden by the anti-trust law, it must show that it is within the area of the economy endangered by a breakdown of competitive conditions in a particular industry.[2] A plaintiff only incidentally injured by a violation of anti-trust laws (i. e. the bystander who was hit but not aimed at) cannot recover.[3] Reference to the words "aimed at" means only that plaintiff

1. 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456, 463 (1957).

2. Conference of Studio Unions v. Loew's Inc., 193 F.2d 51, 54–55 (9th Cir. 1951), cert. denied 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

3. Karseal Corporation v. Richfield Oil Corporation, 221 F.2d 358 (9th Cir. 1955). [The case relies upon the *Loew's* decision].

must show that its affected operation was "within the area of the economy which is endangered," and within the area of defendant's illegal practices.[4]

There are a number of cases in which recovery was denied a plaintiff on the basis that the damages sustained were indirect, remote or derivative. These cases lend themselves neatly to categorization by the relationship of the parties. For example, landlords of injured lessees have been denied recovery.[5]

Others which have been denied recovery are suppliers of an injured customer,[6] a partner in an injured business partnership,[7] a patent owner for losses to his licensee,[8] an insurance agent for an injured underwriter,[9] members of an injured association [10] by a franchiser of injured franchisees,[11] customers of an injured seller,[12] or stockholders in an injured corporation.[13] The common bond

4. Twentieth Century Fox Film Corporation v. Goldwyn Productions, 328 F.2d 190 (9th Cir. 1964), cert. denied 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). [The case indicates that the meaning of "aimed at" in the *Karseal* decision is derived from the language of the *Loew's* case.]

5. Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963) aff'd 332 F.2d 269 (2nd Cir. 1964) [Lessor whose tenant was a member of the conspiracy and who had a net profits percentage clause in the lease could not recover]; Erone Corp. v. Skouras Theatres Corp., 166 F.Supp. 621 (S.D.N.Y. 1957) [Non-operating lessor-owners of theaters could not recover against owners of competing movie houses who conspired to monopolize preferred runs of motion pictures]; Harrison v. Paramount Pictures, 115 F.Supp. 312 (E.D.Pa.1953), aff'd 211 F.2d 405 (3rd Cir. 1954), cert. denied 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954) [Lessor whose lessee had an illegal agreement with motion picture producers to show second instead of first run motion pictures could not recover.]

6. Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963) [A corporation which supplied raw materials to a manufacturer could not recover for illegal acts which lowered the output of the manufacturer, notwithstanding that both corporations were owned by the same individuals.]

7. Coast v. Hunt Oil Co., 195 F.2d 870 (5th Cir. 1952) cert. denied 344 U.S. 836, 73 S.Ct. 46, 97 L.Ed. 651 (1952) [A partner in a partnership which owned a refinery could not recover lost profits from shutting down and eventual cutting back of production when the refinery reopened.]

8. Productive Inventions, Inc. v. Trico Prods. Corp., 224 F.2d 678 (2nd Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956). [Patentee could not recover royalty losses because of exclusive agreements which deprived its licensee of business.]

9. Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.1957), aff'd 242 F.2d 758 (1st Cir. 1957), cert. denied 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed. 2d 41 (1957) [An insurance broker could not recover compensation he would have received had he placed a contract for group insurance for the insurance company he represented.]

10. Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959) [Writers and composers, as members of the association, were not allowed to recover for damages caused by attempted monopolization of the rights to public performance of musical compositions for profit. This injury was derivative in its nature.]

11. Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Cos., 382 F.2d 925 (10th Cir. 1967). [Franchising corporation was not allowed to recover for loss of franchising fee and percentage of business where the illegal acts of defendants consisted of urging association members to "sponsor" a single appraiser in the locality.]

12. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 315 F.2d 564 (7th Cir. 1963) [The State of Illinois, as representative of the people who purchased electricity from plaintiff, was not allowed to intervene an anti-trust suit charging defendant electrical equipment manufacturer with conspiracy to fix prices, etc.]

13. Ash v. International Business Machines, Inc., 353 F.2d 491 (3rd Cir. 1965), cert. denied 384 U.S. 927, 86 S.Ct. 1446, 16

of these cases is that the plaintiff, who is denied recovery, never occupies the same position in the economy as does the party directly hit by the illegal acts of the defendant.

In the posture of this case, plaintiff and Kamen were both engaged in the distribution of plumbing fixtures. Plaintiff operated out of Hutchinson, Kansas and Kamen operated from offices, two of which were located in Wichita, Kansas and in Garden City, Kansas. The Cities of Hutchinson and Garden City along with part of Wichita are all located in a geographical area west of U. S. Highway 81 in Kansas, said area being alleged to have suffered the greatest impact from the illegal acts of the defendant. These facts place plaintiff and Kamen in the same area of the economy, both geographically and competitively. Plaintiff makes no claim that defendant made any attempt to make exclusive dealing or tie-in arrangements under threat of franchise termination at plaintiff's business in Hutchinson. Plaintiff seeks to have this Court protect what it alleges to be a valuable property right, that being the value of its original contract with Kamen.[14]

Plaintiff has alleged that Kamen held 75% of the wholesale market west of U. S. Highway 81 in Kansas prior to its negotiations with plaintiff. It seems rather clear that the monopolistic tendencies of the defendant would find their best target in Kamen which already held the lion's share of the market, rather than in plaintiff which sought to cease doing business. Assuming this to be true, plaintiff has brought itself into the area of the economy which would be endangered by a breakdown of competitive conditions.[15] Plaintiff has alleged, and for our purpose here, it appears that agents of the defendant knew that part of the contract between plaintiff and Kamen involved the "franchise" to sell the defendant's products. Thus the defendant could reasonably foresee that plaintiff's operation would be affected in the form of diminution in value received under the new sales agreement.[16] As we read the test set out in Conference of Studio Unions v. Loew's, Inc., *supra* and as interpreted in Twentieth Century Fox Film Corporation v. Goldwyn, *supra* plaintiff has alleged facts which bring it within the so-called "target area." In our opinion this finding is also in accord with the "directness rule" as discussed in Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Cos., 382 F.2d 925 (10th Cir. 1967).

It is ordered that defendant's motion for summary judgment be and the same is hereby denied.

## MEMORANDUM OF OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE MERITS

This is an action for treble damages under 15 U.S.C. § 15,[1] wherein the plain-

L.Ed.2d 531 (1966). [Minority stockholder's damages were derivative and he had no standing to enjoin I.B.M. from acquiring a corporation which would weaken the competitive position of the corporations in which he held stock.]

14. Interference with a valid contract constitutes an actionable injury to property. See First Nat. Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); North Texas Producers Association v. Young, 308 F. 2d 235 (5th Cir. 1962); [For background of the *First Nat. Bank* case see Waldron v. British Petroleum Co., 231 F.Supp. 72 (S.D.N.Y.1964); Waldron v. Cities

Service Co., 361 F.2d 671 (2nd Cir. 1966). Waldron died during the litigation and First National was substituted in place of his wife, who was acting as his executrix. See Waldron v. British Petroleum Company, 38 F.R.D. 170 (D.C.1965).

15. See Conference of Studio Unions v. Loew's, Inc., 193 F.2d at 54–55, *supra*.

16. See Twentieth Century Fox Film Corporation v. Goldwyn, 328 F.2d at 220, *supra*.

1. 15 U.S.C. § 15 provides:
   "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may

tiff, H. F. & S. Company contends that the defendant American Standard, Inc., a manufacturer of plumbing fixtures, engaged in certain monopolistic practices in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[2]

In May, 1966, H. F. & S. which was an authorized distributor of American Standard Products, determined to sell its plumbing and heating business to Kamen Supply Company, such sale being contingent upon Kamen's acquiring the right to sell the American Standard line. Plaintiff contends that defendant refused to grant a distributorship to Kamen, without Kamen's agreement for exclusive distribution, such condition being an effort by defendant to monopolize the plumbing fixture business in Kamen's trade area. Kamen refused to agree to an exclusive distributorship, and plaintiff contends that it was damaged in its business and property in that the sale to Kamen was finally made at a reduced price, and that other losses arose out of the sale, which plaintiff alleges were attributable to defendant's wrongful act.

In overruling defendant's motion for summary judgment, this Court has previously determined that if plaintiff's various allegations are true, it has standing to maintain this action inasmuch as the injury of which plaintiff complains would not be so indirect, derivative or secondary in nature as to be beyond the protection of 15 U.S.C. §§ 2, 15. See discussion, Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Companies (10th Cir. 1967) 382 F.2d 925, and the Order of December 19, 1968, [Dkt. 25 see supra] denying motion for Summary Judgment.

The matter has been tried to the Court, and after consideration of the testimony of the witnesses, various documentary exhibits, and the stipulations of the parties, the Court re-adopts those views of the law set out in its Order denying defendant's motion for summary judgment and by reference made a part hereof, and makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

Plaintiff, the H. F. & S. Company, Inc., is a corporation, existing under and by virtue of the laws of the State of Kansas, with its principal place of business at Hutchinson, Kansas.

Defendant American Standard, Inc., is a corporation existing under and by virtue of the laws of the State of Delaware with its principal place of business located in New York City, New York. Defendant is the largest manufacturer of plumbing equipment and fixtures in the United States, and at the time this action was filed, it maintained twenty-three manufacturing plants, in twenty-two locations in the United States.

The defendant was incorporated in Delaware in 1929 to acquire the capital stock of American Radiator Company and the Standard Sanitary Manufacturing Company, both of which were organized as New Jersey corporations in 1899. The name of defendant corporation was changed from "American Radiator and Standard Sanitary Corporation" to American Standard, Inc.," in June, 1967.

The defendant manufactures a variety of products, which include plumbing fixtures, plumbing fittings and heating and air conditioning equipment. Distribution of its products is handled through branches, agents, and sales offices located throughout the world.

---

sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

2. 15 U.S.C. § 2 provides:
   "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor . . . "

This action is primarily concerned with the plumbing and heating division of defendant corporation. Specifically involved is the plumbing fixture line of products manufactured and distributed by defendant, including cast iron, china and brass fixtures. Defendant's sale volume exceeds one-half billion dollars annually, and a large portion of this is attributable to plumbing fixtures. All products involved are manufactured in states other than Kansas, and all such products reach Kansas through various modes of interstate transportation.

There are at least four major manufacturers of plumbing fixtures in the United States. They are the defendant, American Standard, the Eljer Company, the Kohler Company and the Crane Company. There are also many smaller manufacturers who produce what is referred to as a "short-line" of plumbing equipment and supplies.

The Court determines that the commodity here involved, may be defined as "plumbing fixtures, brass and related items"—this term to include bathtubs, water closets, lavatories, the brass that goes on these fixtures, stubbed up to the wall. This equipment would also include a water heater, kitchen sink, kitchen sink fittings, and kitchen disposal. The term does not include actual plumbing of the house, or the labor involved in such plumbing.

The four major manufacturers of plumbing equipment, named above, produce a complete line of plumbing fixtures, brass and related items. The term "complete line" may be defined as the production of all types of fixtures, for houses, apartments, hospitals, laboratories, educational facilities, and other types of industrial installation. The smaller manufacturers, with their "short-lines" of products, generally manufacture fixtures and fittings suitable for use in homes or apartments, but generally they would not produce the type of items needed for industrial use.

The major manufacturers of plumbing supplies sell their products through authorized distributors. The short-line manufacturers also sell their products through distributors, but also dispose of their goods through what is termed "direct to you" distributors, such as local lumber yards, hardware stores, and such establishments as Sears Roebuck & Company, and Montgomery Ward. At the time involved in this action, the products of all of the major manufacturers of plumbing fixtures, as well as many of the smaller manufacturers were being distributed and sold throughout the State of Kansas.

In 1966 the defendant maintained a midwestern sales district office for its plumbing and heating business in Kansas City, Missouri, and it is through that office that the defendant distributes its products in the geographical area with which this matter is concerned.

Until June, 1966, plaintiff H. F. & S., whose corporate name at that time was the Hutchinson Foundry & Steel Company, Inc., was an authorized distributor of defendant's products, selling them throughout central and western Kansas from its warehouse in Hutchinson, Kansas. Although plaintiff's sales of American Standard products had been declining during the past several years, it was a distributor "in good standing". Plaintiff did not, however, have any written "franchise" or distributorship agreement with defendant, and plaintiff had no assignable interest in its authority to sell American Standard Products.

In addition to American Standard fixtures, plaintiff also maintained a stock of Kilgore fixtures, it warehoused American Standard cast iron boilers, and also boilers manufactured by the Kewanee Company. [Ex. 10, p. 14]

In the Spring of 1966, plaintiff decided to sell the plumbing and heating division of its business to the Kamen Supply Company, Inc., of Wichita, Kansas. Prior to that time, and in April, 1966, the defendant learned of the intended sale, and a Mr. Pierce, defendant's district sales manager, telephoned Mr. John Urban, manager of plaintiff's plumbing and heating division, to remind him that the sale of plaintiff's

business would not necessarily carry with it the right to distribute defendant's products, since American Standard reserved the right to determine who would be authorized to sell its products.

Kamen Supply, which maintained offices in Wichita, Topeka, and Garden City, Kansas, had been an Eljer distributor since the late 1930's. They also sold the Crane line of fixtures, which distributorship they acquired when they bought the Crane branch store in Topeka. Their primary stock of Eljer products was held in Wichita, with the Crane stock being located in Topeka, but both the Eljer and Crane lines were sold through their Garden City office. Kamen also sold secondary lines of plumbing fixtures, such as Gerber and Kilgore, and they handled fittings and brass manufactured by Crane, Eljer, Delta and Price-Pfister. [Ex. 10, p. 17]

On May 5, 1966, plaintiff and Kamen Supply Company signed a contract for sale of plaintiff's plumbing business to Kamen. Kamen agreed to pay $265,000 for plaintiff's inventory, customer lists, and other purchasing and production information, and the sum of $5,000 for machinery, furniture, office equipment and certain vehicles, the total sales price thus being $270,000. [Ex. 1, pp. 3, 4].

The contract of May 5, 1966 included a provision that Kamen would have the right to terminate the agreement unless plaintiff delivered to Kamen, by May 18, 1966, an American Standard franchise commitment, satisfactory to Kamen, which would enable Kamen to distribute American Standard products to the extent and in the same manner as plaintiff had prior to closing. Kamen was required to exercise this right of termination by May 23, 1966. [Ex. 1, p. 22].

The first attempt plaintiff made to have Kamen appointed an American Standard distributor was on May 9, 1966, when Frederick Richmond, President of plaintiff, met with Mr. Pierce, district manager of defendant, in Kansas City. Mr. Pierce reminded Mr. Richmond that the sale of plaintiff's business did not necessarily carry with it the right to distribute American Standard Products. Mr. Richmond was informed that a market study of the Hutchinson-Dodge City area would have to be made, and that it would be June before any decision could be made. [Stipulation, Exs. 12, 13.]

Mr. H. C. Pierce, manager of defendant's Kansas City office, knew, as of May 9, 1966, that the agreement between plaintiff and Kamen provided that plaintiff would provide the right to Kamen to distribute American Standard Products.

On May 23, 1966, Kamen served written notice of termination of the sales contract because of plaintiff's failure to deliver the American Standard franchise, as provided in § 22 of the contract. [Ex. 3]. While Kamen served such written notice for the purpose of protecting itself, plaintiff and Kamen did not break off negotiations for the sale, and plaintiff continued with its efforts to secure the franchise for Kamen. [Exs. A, 14, 14A, 14B].

Meanwhile a study of the "Hutchinson-Dodge City Trade Area" was made by defendant's employee, Carl D. Winbigler, and his written report appears as Exhibit 10. This report covers only a small portion of western Kansas, and it is based on estimated values of new residential construction 1962–1965.

A review of the trade study as a whole reveals that Winbigler was of the opinion that American Standard was not getting its "fair share" of the business in western Kansas, that American Standard had gradually "lost ground" in the years since 1962, dropping from 21% to 41% below "normal attainment", and that in his opinion, American Standard's volume in the Hutchinson-Dodge City trade area represented only 25% of the total volume available in that study area. [Ex. 10, pp. 3–5].

Plaintiff's sales of American-Standard products had declined nearly 50% during the two years preceding 1966. It was Winbigler's opinion that lack of aggressiveness on the part of plaintiff was

probably the cause of such decline. [Ex. 10, p. 14].

Mr. Winbigler's report further disclosed that that much of the materials going into residential work in the Garden City area was being supplied by "direct to you" firms, with builders and homeowners buying fixtures direct, then hiring the labor for the plumbing to be put into place. [Ex. 10, p. 7.]

Mr. Pierce and other employees of defendant arranged a luncheon meeting for Harlan Kamen of Kamen Supply, for the purpose of discussing an American Standard distributorship which was held on June 13, 1966 in Wichita, Kansas. Present at the meeting were three employees of defendant, and Kamen and his attorney. No person representing plaintiff was at this meeting.

The parties discussed Kamen's pending purchase of plaintiff's business, Kamen's sales organization, Kamen's desire to obtain the American Standard distributorship, and the effect this would have on defendant's existing distributors in the Wichita trade area. Mr. Kamen was advised that the distributorship would be granted to him only if he agreed to handle American Standard products on an exclusive basis in Garden City and Hutchinson. Mr. Kamen refused to agree to this proposition, but the following day made a counter-offer whereby he would handle defendant's products on an exclusive basis at Hutchinson, but on a "split-house" basis in Garden City. Defendant did not accept this counter-offer, no further negotiations ensued between defendant and Kamen, and Kamen was never granted a distributorship, except that, after Kamen completed the purchase of plaintiff's business at a later time, he was permitted to purchase "fill in" and other items for a limited period of time in order to enable him to dispose of plaintiff's inventory of American Standard products.

Exhibits 16, 18, 19 reflect the defendant's interoffice communications wherein it was decided not to grant Kamen the distributorship. Mr. Pierce recommended this action to his superior, based upon his own analysis and the trade study prepared by Mr. Winbigler:

"I do not see where they would give us the additional dollars that we need, and I strongly feel the business we would pick up, would be because of the accessibility to Kamen of three major lines in the immediate area of Wichita, to the detriment of our present outlets. . . . My decision was strengthened also by the fact that the Kamen interests in Western Kansas would be promoting their present lines in conflict to our best interests." [Ex. 18]

In May, 1966, one employee of defendant estimated that if defendant could expect Kamen to purchase $450,000 of American Standard products, $380,000 of that figure would be at the expense of existing customers of defendant, and that it was probable that some of these American Standard distributors in Kansas would drop the line, or take on competitive second lines. [Ex. 11].

Although Kamen was unsuccessful in obtaining the American Standard distributorship, plaintiff ultimately sold its business to Kamen, pursuant to a June 27, 1966 amendment to the original contract of May 5th. [Ex. 4]. Under the terms of this agreement, plaintiff's American Standard inventory was excluded from the assets, Kamen agreed to pay $175,000 for the remaining inventory, customer lists, etc., and $6,000 for furniture, equipment, and vehicles, for a total price of $181,000. Plaintiff retained title to the American Standard inventory and placed it in the hands of Kamen for sale on consignment, with Kamen agreeing to pay to plaintiff the first $40,000 received from the sale of the American Standard items. [Exs. 4–8].

After an adjustment attributable to sales made from the American Standard inventory pending transfer of the business to Kamen, the net difference between the two contracts was in the sum

of $78,000.[3] The American Standard inventory, which was taken out of the sale, and placed on consignment by plaintiff, was eventually sold by Kamen over a three-year period at a total price of $33,204.00, which sum was remitted to plaintiff, per the agreement. The result of these transactions resulted in a net difference between the two sales contracts of $44,796.00. In addition, plaintiff expended approximately $2,500 in travel and legal fees occasioned by the delay in closing the sale with Kamen.

The activities of defendant of which plaintiff complains have their greatest impact in that area of Kansas west of Highway 81. The Court determines that the relevant geographical area which is involved in this controversy may be defined as that area of Kansas lying west of Highway 81, excluding the two major cities through which Highway 81 runs, that is, the City of Wichita, and the City of Salina, Kansas.

In 1965–1966 numerous plumbing distributors had salesmen travelling in this geographical area. By means of these distributors all four of the major plumbing manufacturers were represented, together with secondary lines produced by such companies as Briggs, Case, Richmond-Rheem, Peerless, Gerber, Kilgore and Universal-Rundle. Some of the jobbers represented in the geographical area maintained their offices in Wichita, Kansas, with "country salesmen" travelling the area out of Wichita. Other jobbers maintained offices in Northern and Western Kansas. A list of some of the jobbers represented in Western Kansas in 1965–1966, with their locations and the major line of plumbing fixtures which each handled, is set out as follows:[4]

| Jobber | Locations | Major Line |
| --- | --- | --- |
| Baker Supply | Hutchinson, Kansas | Kohler |
| Cantrell Supply | Wichita, Kansas | Kohler |
| Hutchinson Foundry | Hutchinson | American Std. |
| Crane Company | Wichita | Crane |
| Kamen Supply | Wichita & Garden City | Eljer & Crane |
| Kansas Wholesale Supply | Wichita | Rheem-Richmond |
| Lee Hardware | Salina | Brass only, Am.Std. |
| A. Y. McDonald | Wichita | Kohler |
| Reeves-Wiedeman | Wichita | American Std. |
| Salina Supply | Salina | Kohler-then Am.Std. |
| Schmidtberger | Hays | Kohler |
| U. S. Supply | Wichita | American Std. |

———◆———

In addition to the foregoing list, the evidence also disclosed there were several additional, smaller, distributors operating in the area, although the evidence failed to indicate the lines of plumbing supplies which they handled. Among such small distributors were C & W Supply, Dodge City; Cen-Kan, at Hays and Great Bend, and Great Plains, Garden City, Kansas.

Sears Roebuck and Montgomery Ward also distribute plumbing fixtures under their own private labels in the relevant geographical area. The Sears products are actually manufactured by Universal-Rundle and the Montgomery Ward products are manufactured by the Eljer Company.

The common practice in Kansas is for each distributor to handle only one of

3. The initial difference between the two contracts is $89,000; however, various items of the American Standard inventory, totalling $11,000, were sold in the ordinary course of business while the sale to Kamen was pending.

4. Testimony of Kamen; Ex. 10, p. 5.

the major plumbing lines, this for the practical reason that it is necessary to buy in "car-load" lots in order for the distributor to take advantage of certain savings in freight rates. Kamen Electrict Supply, which sold both Crane and Eljer, was the only distributor in the area which handled two major lines during the relevant time in controversy.

The evidence established, however, that most distributors handled one or more "secondary lines" of plumbing fixtures in conjunction with sales of the principal line which they might handle. For instance, the U. S. Supply Company of Wichita, which was the largest distributor of American Standard products in the area, also distributed products manufactured by the Kilgore Company. The Court finds that all American Standard distributors in the State of Kansas including the American Standard "branch house", a division of American Standard, carried secondary and more competitive lines of fixtures and brass.

Sale of plumbing fixtures and fittings in 1965–1966 in the relevant geographical area was keenly competitive. The products of the four major manufacturers were barely distinguishable one from another, and it might be necessary to inspect the label before one could ascertain whether a bathtub or other fixtures had been manufactured by Eljer or one of the other three major competitors. Sometimes, one of the manufacturers might have an item which was not included in a competitor's products; thus, Crane's line of hospital fixtures and equipment was more extensive than that produced by Eljer.

In 1965–1966, all major lines enjoyed more or less equal acceptability in Western Kansas, although various plumbing contractors might have an individual preference for one brand or another. When advertisements for bids were published, the specifications might list a brand and fixture number for one of the major manufacturers, say Eljer, but with a provision that American Standard, Kohler or Crane would be acceptable. In some instances, the specifications would not allow substitutions, because work was in an existing building which would require the same type of fixtures then in place.

In bidding on projects in Western Kansas in 1965–1966, comparative prices among the major competing brands were a minor factor because, basically, every distributor's cost was the same. A job with 20 different fixtures would require various types of trim; one fixture might have identical prices, regardless of brand, while another would not, but different brass fittings could be used. While individual prices on all items might vary slightly, the total price on a job would be so nearly identical, that there would be no appreciable cost difference. More important than price was the "length" of the line, its acceptability for the job, availability and delivery schedules, and that intangible item denoted as "service" which a distributor is able to provide for his customers.

The evidence relating to the various "shares" of the market held by the four major producers of plumbing items during 1965–1966 in the relevant geographical area was sharply in dispute. A witness for plaintiff, Mr. Kamen, estimated that the total volume of the plumbing business in Western Kansas was approximately $1,250,000, that American Standard had 63.13% of that business in 1965–1966, and that if Kamen Supply had agreed to defendant's demand for an exclusive dealership, the American Standard share of the business would have increased to a net figure of 74.47% of the total business.[5]

On the other hand, witnesses in the employ of the defendant American Standard were of the opinion that, whatever the total volume of business may have been, defendant was getting only about 10% of it, and that, even if Kamen had agreed to the exclusive arrangement, that share would only have increased to less than 20% because El-

---

5. According to Kamen, this figure excluded short line sales.

jer and Crane would have continued their competitive efforts in the territory, and any American Standard sales made by Kamen would have been obtained mostly at the expense of other American Standard distributors already competing in the area.

The Court has carefully reviewed the transcript of the testimony relating to the pertinent volume of business and the respective share of that business held by American Standard, all as presented by the exhibits and testimony of Mr. Kamen, Mr. Pierce, and Mr. Winbigler. Such review has led to the conclusion that there is an absence of probative, and convincing evidence which would enable this Court to reliably make findings of fact relating to the total volume of sales during 1965–1966 of plumbing supplies in the relevant geographical area, or to determine what the relative shares of the four major manufacturers may have been during that period.

This is not to say, that the Court feels that any witness testified falsely in the matter. Mr. Kamen appeared to be an intelligent, astute and successful businessman, but his testimony regarding this issue was based in most cases upon his own personal "estimates" of what his competing jobbers were doing, modified by certain "rule of thumb" adjustments for various factors. His figures did not take into account plumbing supplies which went into individual housing units or renovation work; the figures did not include sales made by "direct to you" distributors such as lumber yards, hardware stores, Montgomery Ward and Sears; and in the Court's mind, did not clearly differentiate the proportion of sales attributable to the numerous "secondary lines" which were available in the trade area, or properly take into account sales which may have been made by some distributors outside the relevant geographical area.

While the evidence is insufficient to allow the Court to make specific findings on volume and proportionate shares, the Court is of the opinion, and so finds that the evidence, taken as a whole, failed to establish that American Standard possessed any more than its "fair share" of the Western Kansas business during 1965–1966, and that, even if Kamen Supply had agreed to handle American Standard products exclusively in its Garden City office, such agreement would have had no appreciable effect upon American Standard's share of the market. In particular, the Court finds that even if Kamen had accepted defendant's proposal, and Kamen had become an exclusive distributor of American Standard products in Western Kansas, this situation would not have tended to exclude defendant's competitors nor would this have given defendant the power to control prices, or to control the plumbing fixture market in the Western portion of Kansas.

## CONCLUSIONS OF LAW

The Court by reference to its prior conclusions of law, appearing in its Order of December 19, 1968, supra, finds that:

The plaintiff's complaint states a claim upon which relief can be had in that plaintiff has standing to sue for the alleged violation of the antitrust laws.

Plaintiff's original contract with Kamen Supply Company, Inc., dated May 5, 1966, was a valuable property right and damage with reference to it was damage to plaintiff's business or property, for which damage the antitrust laws afford a right of recovery.

In addition to the foregoing, the Court makes the following additional conclutions of law.

■■ The essence of a "monopoly" is the power to control prices or to exclude competition. The "monopoly power" which must exist in order to establish a violation of § 2 of the Sherman Act may be defined as the power to fix prices, to exclude competitors, or to control the market in the relevant geographical area in question. Granader v. Public Bank (E.D.Mich.1967), 281 F.Supp. 120, aff'd (6th Cir.) 417 F.2d 75; cert. den., 397

U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686; Denver Petroleum Corporation v. Shell Oil Company (D.C.Colo.1969) 306 F. Supp. 289, 301.

■ The plaintiff has the burden of establishing that the defendant not only attempted to acquire an unlawful monopoly in an impermissible manner, but that there was a dangerous probability that had the attempt succeeded, defendant would have acquired an unlawful monopoly. See Hiland Dairy, Inc. v. Kroger Company (8th Cir. 1968) 402 F.2d 968, 971, cert. den. 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748; Cliff Food Stores, Inc. v. Kroger, Inc. (5th Cir. 1969) 417 F.2d 203, 207.

■ In order to establish the requisite dangerous probability of success, plaintiff has the burden of proof and must establish that the probable market power of the defendant in the relevant geographical area in question, after the commission of the alleged unlawful acts, would have been sufficient to constitute the power to monopolize. See Becker v. Safelite Glass Corporation (D.C.Kan. 1965) 244 F.Supp. 625; Bernard Food Industries, Inc. v. Dietene Company (7th Cir. 1969) 415 F.2d 1279, 1284, cert. den. 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed. 2d 92.

■ The refusal by a manufacturer to sell to a distributor, unless the distributor will handle its products exclusively, is not a per se violation of the Sherman Act, and in an attempt to monopolize case, plaintiff must establish, in addition to the required market power, a specific intent to monopolize. See Bank of Utah v. Commercial Security Bank (10th Cir. 1966) 369 F.2d 19, 26 cert. denied, 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456; Amplex of Maryland, Inc. v. Outboard Marine Corporation (4th Cir. 1967) 380 F.2d 112, cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968); Ricchetti v. Meis-

ter Brau, Inc. (9th Cir. 1970) 431 F.2d 1211, cert. denied 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219.

■ In light of the foregoing facts, the Court is of the opinion, and so concludes that the evidence offered by plaintiff failed to establish the total business available in the relevant geographical area; that it failed to establish the proportionate shares of that business enjoyed by the major plumbing manufacturers; and that it failed to establish that the actions of defendant in the matter of the Kamen distributorship, had they been successful, would have tended to drive out competition or to unreasonably restrain competition. All of the evidence establishes that the manufacturers of plumbing equipment were engaged in highly competitive activities in the western portion of Kansas, and that this competition would have continued, even if Kamen had accepted defendant's proposition. There was no likelihood, let alone a dangerous probability, that such competition would have been foreclosed or unreasonably restrained, even if Kamen had distributed American Standard products exclusively in that area. See Becker v. Safelite, etc., *supra*, 244 F. Supp. at 638; Bank of Utah v. Commercial Security Bank, *supra*, 369 F.2d 19.

In accordance with the foregoing findings and conclusions, the Court determines that plaintiff's evidence failed to establish that defendant attempted to monopolize trade and commerce in plumbing fixtures in the trade area of Western Kansas, in violation of 15 U.S.C. § 2, and that, under such circumstances, judgment should be entered in favor of defendant upon plaintiff's cause of action. Accordingly,

It is ordered that judgment be entered in favor of the defendant, American Standard, Inc., in this action, the Clerk to enter same in accordance with the provisions of Rule 58, Fed.R.Civ.Proc.